872 P.2d 701

John LEWIS and Ann Lewis, husband and wife, Plaintiffs–Counterde-fendants–Respondents,

v.

Robert C. HUFF and Judy Huff, husband and wife, R.C. Holdings, Inc., a Califor-nia corporation, Defendants–Counter-claimants–Appellants.

No. 19239.

Supreme Court of Idaho,
Boise, March 1993 Term.

Feb. 10, 1994.

Rehearing Denied May 12, 1994.

Givens, Pursley, Webb & Huntley, of Boise, for appellants. Robert C. Huntley, Jr. argued.

Roark, Rivers & Phillips, of Hailey, for respondents. Ray Keith Roark argued.

JOHNSON, Justice.

This case concerns a joint venture for the construction of commercial buildings and a hotel in Ketchum, Idaho.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

John Lewis was introduced to Robert C. Huff through a real estate broker who had agreed to help Huff locate additional potential investors for Huff's Boulder Mountain Village Hotel construction project (the project) in Ketchum. In April 1989, Lewis and Huff signed various agreements. Under these agreements, Lewis was to take over management of the hotel and receive a one-half share in the project in exchange for investing capital and securing further credit. Lewis was to receive his share in the form of one-half of the shares of R.C. Holdings, Inc. (R.C. Holdings), in which Huff was majority shareholder prior to the signing of the agreements by Lewis and Huff.

In June, 1989, Lewis wrote two letters of rescission citing ten grounds for rescinding the agreements. Huff and Lewis met and discussed the letters of rescission on or before July 3, 1989. Lewis demanded that he be paid back his initial investment and that Huff assume liability for money expended from a line of credit. Lewis later testified Huff told Lewis that the rescission would be "no problem." Huff testified that he said he would try to find financing so that Lewis could get out of the deal. Lewis delivered and Huff accepted Lewis's keys to the hotel he had been managing. On July 10, 1989, Huff wrote Lewis a letter stating that he disagreed with the bases for rescission contained in Lewis's letters, but that Lewis's decision was "one we will just have to live with."

The parties negotiated during the ensuing summer to settle their differences. In September, 1989, Lewis and his spouse filed an action for rescission by right and for other relief against Huff, his spouse, and R.C. Holdings. Huff and his corporation filed a counterclaim in October, 1989, alleging fraud, breach of contract, violation of the securities laws, and declaratory relief. In October, 1989, Huff also gave Lewis a notice of default pursuant to the agreement for Lewis's purchase of R.C. Holdings stock (the basic agreement), which contained a seventy-five day notice and cure provision.

Huff later filed an amended counterclaim alleging claims against Lewis under the federal and state racketeering [RICO] acts and asserting, in the alternative, a right to punitive damages. Specifically, Huff alleged that in addition to the situation between himself and Lewis, Lewis had engaged in two earlier "fraudulent schemes to acquire the wealth of others."

In his RICO act claims in this case, Huff alleged, among other things: (1) Lewis telephoned Richard Racich, an investor in the project, and, when Racich refused to cooperate with Lewis, told Racich that Lewis would have Huff put in jail for allegedly stealing from the project and that Racich would lose his entire investment; (2) Lewis attempted to remove from R.C. Holdings all available cash by writing a corporate check payable to himself, but the bank refused to honor the check because it did not bear the required two signatures; (3) Lewis later contacted Racich in an effort to purchase at a discount a note and trust deed representing an amount loaned to the project in order to push Huff out of the project; and (4) Lewis purchased a note payable by R.C. Holdings to Kreizenbeck Constructors, Inc. (Kreizenbeck Constructors) through a corporation incorporated with Lewis's twenty-one year old son as president; Lewis did so to conceal the fact

that Lewis was in fact purchasing the note, after which he immediately instituted foreclosure proceedings on the deed of trust on the Boulder Mountain Village real property which secured the note.

After negotiations broke off between Lewis and Huff, Huff turned to a business associate, Robert Thompson, in an effort to replace Lewis. Thompson agreed to become involved in the project only if Lewis was not part of the deal. Huff had R.C. Holdings incur more debt without notice to Lewis, and also caused the corporation to enter into a limited partnership with Thompson's development company, Thompson Devco, Inc. (Thompson Devco), so that an interest in the project was granted to Thompson Devco. In March, 1990, Lewis's shares in R.C. Holdings were sold.

Huff's bookkeeper prepared a financial statement for R.C. Holdings stating in a footnote that Huff had accepted Lewis's rescission and that their agreements were null and void. This financial statement was given to a bank and then revised to remove the footnote.

The case was tried to the trial court, sitting without a jury. At trial, the Lewises pursued their claim for rescission. The trial court bifurcated the proceeding, holding Huff's racketeering claims in abeyance. Following the trial, the trial court issued findings of fact and conclusions of law, and entered a judgment in favor of the Lewises. The basic premise of the trial court's decision was that there was a mutual rescission by Lewis and Huff. Huff filed a motion to alter or amend the findings, conclusions, and judgment or for a new trial, alleging seventy-seven errors of fact and law in the trial court's decision. The trial court denied Huff's motion. Huff appealed.

## II.

### THE TRIAL COURT WAS CORRECT IN CONSIDERING ACCEPTANCE OF RESCISSION BY HUFF.

■ Huff asserts that the trial court should not have considered acceptance of rescission by Huff because the Lewises never pleaded their case on the theory that there

was a mutual rescission, nor did the Lewises move to amend their pleadings to conform to the proof. We disagree.

The Lewises pleaded rescission in both their complaint and in their answer to Huff's counterclaim. In addition, the record indicates that Huff responded to the theory of mutual rescission weeks before the trial and during the trial itself. Huff never objected to the introduction of any of the Lewises' evidence on the ground that the evidence was outside the pleadings.

I.R.C.P. 15(b) provides:

When issues not raised by the pleading are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues....

In addition, Huff has not indicated that he was prejudiced by the lack of opportunity to present witnesses or evidence on the question of mutual rescission.

## III.

### THE TRIAL COURT PLACED THE BURDEN OF PROOF ON THE LEWISES TO PROVE THAT HUFF VOLUNTARILY AGREED TO A RESCISSION.

■ Huff asserts that the trial court failed to place the burden on the Lewises to prove that Huff voluntarily agreed to a rescission. In *M.K. Transport v. Grover*, 101 Idaho 345, 349 n. 5, 612 P.2d 1192, 1196 n. 5 (1980), the Court stated: "An intent to rescind a contract may be inferred.... However, such a rescission is in effect a parol modification of the written agreement which in Idaho must be proven by clear and convincing evidence." In the present case, the trial court concluded that Huff's acts, as found by the trial court, clearly showed that Huff agreed with Lewis's rescission. This conclusion indicates that the trial court placed the burden on the Lewises

to prove mutual rescission by clear and convincing evidence and concluded that the Lewises had carried this burden.

## IV.

### THERE IS SUBSTANTIAL AND COMPETENT EVIDENCE TO SUPPORT THE TRIAL COURT'S CHARACTERIZATION OF HUFF'S ACTIONS AS ACCEPTANCE OF LEWIS'S OFFER OF RESCISSION.

■ Huff asserts that the trial court incorrectly characterized his "efforts to mitigate damage caused by Lewis's breach" as "acceptance of Lewis's offer of rescission." We conclude that there is substantial and competent evidence to support the trial court's characterization.

■ In *Jensen v. Chandler*, 77 Idaho 303, 307, 291 P.2d 1116, 1118 (1955), the Court held that refusal of one party to comply with a contract, in which refusal the other party has acquiesced, constitutes implied rescission by consent. Rescission, an equitable remedy that totally abrogates the contract, may be granted when there is a mutuality of assent to rescind. This mutuality of assent may be express or implied. *Lowe v. Lym*, 103 Idaho 259, 262, 646 P.2d 1030, 1033 (Ct. App.1982). Where the facts of a case clearly establish that the parties have mutually consented to a rescission, it may be determined as a matter of law that there has been a rescission. *Id.* at 263, 646 P.2d at 1034.

The trial court based its conclusion that between June 27, 1989, and October 4, 1989, Huff clearly acquiesced in, and agreed with, Lewis's rescission on the following acts of Huff:

1. The July 3, 1989, meeting between Huff and Lewis in which Huff agreed to the rescission and to obtain funds or financing to pay Lewis back for monies paid or advanced under the agreement. In this meeting Lewis personally delivered, and Huff personally accepted, Lewis's keys to the hotel.

2. The July 10, 1989, letter from Huff to Lewis acknowledging the July 3 conversation and terming the decision to rescind "one we have to live with," again pledging to obtain the funds necessary to pay back Lewis.

3. Huff's accepting the resignation of the Lewises as officers and directors of R.C. Holdings on June 30, 1989, by electing himself president and his wife as secretary of R.C. Holdings. In Lewis's letters of rescission, the resignation of the Lewises was conditional upon Huff accepting the rescission.

4. Huff's causing to be prepared and filed in the corporate records of R.C. Holdings a "Unanimous Written Consent of Director to Corporate Action," dated June 30, 1989. This was implicitly premised on Huff being the only director because he had accepted the resignation of the Lewises.

5. Huff's creating, without notice of any kind to Lewis, a liability of R.C. Holdings in the amount of $312,000.00, and causing the corporation to issue a promissory note for this amount to Kreizenbeck Constructors, which led to the recording of a trust deed securing the obligation against R.C. Holdings's assets. This obligation represents an assumption by R.C. Holdings of a debt owed by Huff's solely owned corporation, The Holding Company.

6. Huff's causing R.C. Holdings to enter into a partnership agreement with Thompson Devco, in which Thompson Devco was granted an eighteen percent interest in the project.

7. Huff's receiving a letter from Ralph Kreizenbeck, dated June 30, 1989, affirming that Huff had accepted the rescission, and Huff's confirming that he had given Kreizenbeck this information over the phone.

8. Huff's telling Morgan Burkett in August 1989 that Lewis was being bought out of the project by Huff. Burkett testified that Huff never thereafter represented to Burkett that Lewis was not being bought out.

Although there is much conflict in the evidence, there is substantial and competent evidence in the record to support these findings. The findings support the trial court's characterization of Huff's actions as acceptance of rescission.

## V.

### THE TRIAL COURT'S REFUSAL TO CORRECT ALLEGED ERRORS IN ITS FINDINGS AND CONCLUSIONS DOES NOT REQUIRE REVERSAL.

Huff asserts that the trial court should have corrected seventy-seven errors in its findings and conclusions, when Huff moved the trial court to do so. As to the findings Huff challenges, we conclude that there was no reason for the trial court to correct them. Virtually all of the challenged findings were supported by substantial and competent evidence and were, therefore, not clearly erroneous. After reviewing of the record, we are uncertain whether there is substantial and competent evidence to support findings 11, 13, 22, 28, and 53. We are unable to discern that any of these findings affected the outcome of the case, however. As to the conclusions of law Huff challenges, the trial court correctly stated the law. Huff's challenges to the conclusions are merely argumentative.

## VI.

### THE TRIAL COURT WAS NOT REQUIRED TO RULE THAT A PARTY WHO IS IN DEFAULT CANNOT UNILATERALLY RESCIND A CONTRACT.

Huff asserts that the trial court should have ruled that Lewis was in default and could not unilaterally rescind the agreement. We disagree.

The trial court concluded that there was mutual rescission, not a unilateral rescission. Therefore, it would have been inconsistent for the trial court to rule that Lewis was in default and could not unilaterally rescind the agreement.

## VII.

### LEWIS'S FAILURE TO INVOKE THE DEFAULT PROVISION OF THE BASIC AGREEMENT DID NOT BAR THE LEWISES' CLAIMS.

■ Huff asserts that the trial court should have ruled that the Lewises' remedy, if any, was to invoke the default provision of the basic agreement. We disagree.

The Lewises chose not to invoke the default clause of the basic agreement. By doing so, they took the risk that either they would be able to prove a basis for rescission or that Huff would accept or acquiesce in mutual rescission. If the Lewises had not convinced the trial court that Huff acquiesced in the mutual rescission, the Lewises might have been confronted with the consequences of their failure to invoke the default provision. Mutual rescission was simply another means of resolving the defaults that the Lewises believed existed in Huff's performance under the agreements.

## VIII.

### THE TRIAL COURT CORRECTLY REFUSED TO ENTER JUDGMENT IN FAVOR OF HUFF FOR DAMAGES AND CORRECTLY REFUSED TO RULE ON HUFF'S PUNITIVE DAMAGE CLAIM.

Huff asserts that the trial court should have entered judgment in his favor for damages of $2,371,945.00, plus interest, and should have ruled on Huff's punitive damage claim. We disagree.

The premise for Huff's assertions is that the trial court did not make a finding of the damages Huff sustained and did not rule on Huff's punitive damage claim because the trial court did not apply the law of repudiation. Instead, the trial court concluded that there was a mutual rescission. Because we have affirmed the trial court's conclusion that there was mutual rescission, we necessarily conclude that the trial court was correct in not entering judgment in favor of Huff for damages and in not ruling on Huff's punitive damage claim.

## IX.

### THE TRIAL COURT CORRECTLY REFUSED TO TRY HUFF'S RICO CLAIM.

■ Huff asserts that after concluding that the parties had mutually rescinded their agreements, the trial court should have pro-

ceeded to try Huff's RICO counterclaim, which had been bifurcated from the other claims. We disagree.

Huff challenges the following conclusion of law of the trial court:

> The rescission having been agreed to by the parties, as determined by the Court, the defendants cannot independently pursue the RICO claim.

Huff argues that the trial court was incorrect in premising its decision not to try the RICO claim on the following reasoning in its memorandum decision:

> Defendants lack standing to maintain a RICO cause of action.

> ■ U.S.C.A. 1962, *Prohibited activities,* in part provides: "to use or invest, directly or indirectly, any part of such income or the proceeds of such income, *in acquisition* of any interest in, or the establishment or operation of, any enterprise...." Idaho Code § 18–7804 uses almost identical language.

> Once the agreements between plaintiff and defendant were rescinded, there ceases to be any business transaction to which RICO statutes apply. Both parties are returned to the status quo. Plaintiff ceases to maintain an interest in defendants' project, and defendant is free to solicit new investors. Consequently, the RICO cause of action is dismissed and summary judgment is granted thereon.

(Emphasis by the trial court.)

■ We agree with the trial court that when the parties rescinded their agreements, there was no basis for Huff to pursue a RICO claim which was based on the transaction that had been rescinded. To allow Huff to pursue his RICO claim in spite of mutual rescission would be to ignore the nature of rescission. Rescission requires restoration to the status quo. *Lowe,* 103 Idaho at 262, 646 P.2d at 1033. The status quo was the position of the parties before the transaction. It would be logically fallacious to say that the transaction is rescinded but that one of the parties can pursue a RICO claim based on the transaction.

## X.

## CONCLUSION.

We affirm the judgment of the trial court.

We award costs on appeal, but not attorney fees, to the Lewises.

TROUT, J., and MICHAUD and CAREY, JJ., pro tems, concur.

BISTLINE, Justice, dissenting.

Much has been written, and there now exists a majority consensus for affirming the rulings, decision, and judgment of the district court, Hon. James J. May. The thought is ventured that Judge May was confronted with an extremely formidable task in presiding over a trial involving hotly contesting litigants, both of whom were represented by extremely competent counsel. The amount of carefully prepared paper work, i.e., exhibits, letters, proposed findings of fact and conclusions of law is demonstrative of their ability and diligence.

In my view, the facts and circumstances of the controversy appear to have been fully developed, and in his turn, Judge May endeavored to ascertain that neither side was shorted. A monument to his undertaking, it seems clear that he conscientiously made findings of fact, and that such were suggested by one or the other of opposing counsel. Likely it was similar with the conclusions of law. A generally well known fact, however, is that diligent counsel representing clients may see some aspects of a controversy differently than does the court, but the court is still the court. When the person sitting as the court is Judge May, my observation over a number of years is that justice is indeed apt to prevail. It is my recollection that over the past years Judge May presided over a great number of cases, equally as varied and difficult as the instant litigation.

As just one member of this Court, I suggest that in this instance Judge May be asked to revisit at least some statements of fact and the characterization of mixed questions of law and fact which leave me with uncertainty, for example:

1. Finding of Fact 18:

"Huff never provided any such corporate balance sheet or statement of basis and total at cost despite the repeated demands of Lewis."

Comment: There is no evidence in the record that Lewis ever requested a balance sheet.

2. Finding of Fact 23:

"THE AGREEMENT, Section V(B)(4), provided that certain undistributed bank construction loan proceeds 'constituted' loans by Huff to R.C. Holdings, Inc."

Comment: The Agreement provides that undisbursed proceeds shall be paid to Huff. There is no mention of loans.

3. Finding 34:

"Kriezenbeck Constructors was owed the approximate sum of $300,000 for unpaid construction work on Boulder Mountain Village ... this indebtedness was not listed and upon receiving title to the real property it became a liability of R.C. Holdings, Inc."

Comment: The record shows that the Kriezenbeck obligation was not that of R.C. Holdings, Inc. but that of The Holding Company.

4. Finding 50:

"The letter (Exhibit 43) promised that Huff would obtain the funds necessary to pay Lewis as soon as possible."

Comment: The letter states: "I will do everything possible to obtain the financing we have previously discussed." No promise was given.

5. Finding 53:

"Huff assured Thompson that Lewis was indeed out of the project."

Comment: This is not supported in the record.

6. Finding 50:

"On or about the 30th of June, 1989, Huff received a letter from Ralph Kriezenbeck recounting that he, Kriezenbeck, had been informed by Huff that Jack Lewis was *no longer part* of the Hotel project and *had been replaced.* Huff acknowledged that he had made the statement to Kriezenbeck in a phone call made from Seattle."

Comment: The letter states: "On June 28th you informed me that Jack Lewis *was being bought out* of the project." Huff's testimony shows that he acknowledged only that he *was seeking to find financing to replace* Lewis. That this had already happened is an inaccurate statement of fact.

7. Conclusion 4. "No such attack [on the accuracy of the grounds for rescission stated in the rescission letter] was ever made until months after the letters were delivered."

Comment: The record shows that Huff's immediate response to Lewis's purported rescission was a letter containing the statement "I disagree with the issues you have cited in reaching your decision...." Plaintiff's Exhibit 43, letter from Huff to Lewis, July 10, 1989.

8. Conclusion 6(c). "[T]he resignation of the Lewises was conditional upon Huff accepting the rescission."

Comment: The Lewises' letter states unequivocally "[w]e hereby resign as officers and directors of the company." Plaintiff's Exhibit 42, letter from Huffs to Lewis, June 27, 1989. There is nothing conditional about this statement.

9. Conclusion 5:

"At no time during these discussions nor at any time prior to the 4th day of October, 1989, did Huff or his representatives raise any claim of breach of contract against Plaintiff."

Comment: Huff's attorney testified that he advised Lewis's attorney that Lewis was in breach during these discussions. As far as can be presently ascertained, this testimony was not impeached.

These selected examples of the district court's findings of fact appear to be inaccurate or slanted in favor of Lewis. Without being able to independently analyze the entire record and all of the testimony presented at the trial, this justice cannot confidently assess the accuracy of the other findings of fact. Without exercising review over the validity of the district court's conclusions of law, it is difficult to ascertain that the conclusions reached by the district court were based on accurate facts. Therefore it is my

opinion that the Court should remand the cause to Judge May, with a request for a more detailed presentation of the underlying factual circumstances, rather than merely affirming.