923 P.2d 446

Alwin L. FARR and Elizabeth J. Farr, husband and wife, individually, and as Trustees of the Farr Family Trust, Plaintiffs – Counterdefendants – Appellants,

v.

Edward G. MISCHLER, and Edward S. Ramey and Liza A. Ramey, husband and wife, Defendants–Counterclaimants–Respondents,

and

Pacific Northwest Investigations, an Idaho corporation, Defendant–Respondent.

No. 21865.

Supreme Court of Idaho,
Coeur d'Alene, May 1996 Term.

Aug. 28, 1996.

Scott W. Reed, Coeur d'Alene, for appellants.

Lukins & Annis, P.S., Coeur d'Alene, for respondents. Mischelle R. Fulgham, argued.

SILAK, Justice.

Alwin Farr (Farr) sought payment of the balance due on an installment contract for the sale of his business. Edward Mischler and Edward Ramey (collectively the respondents) counterclaimed, alleging that Farr had misrepresented the business' client base and goodwill. After the jury returned a verdict in favor of the respondents, the district court entered an order rescinding the sales contract. We affirm.

## I.

### FACTS AND PROCEDURAL BACKGROUND

Farr owned and operated Pacific Northwest Investigations, Inc. (PNI) which performed investigative services relating to worker's compensation claims. In 1990, the respondents began negotiations with Farr for the purchase of PNI. On October 11, 1991, the respondents executed a sales agreement. The purchase price was to be $90,000, with $30,000 down and the remaining amount to be paid in monthly installments over six years. In return, the respondents received 800 shares of stock in PNI, the inventory and fixtures held by the corporation, and $10,000 in uncollected accounts receivable. The sales contract also stated:

*Customers.* The Corporation has a customer base upon which the income has been derived for past work. No contracts exist with these customers for the continuation of services by the Corporation, and no guarantee is made by the Sellers these customers will continue their working relationship with the Corporation. The Sellers know of no disputes currently involving the past customers except for one (1) past customer by the name of Shapiro. Mr.

Shapiro is presently disputing an account with the Corporation. The Sellers agree to hold the Buyers and the Corporation free of any suit or claim concerning said account. Sellers know of no other disputes or claims against the Corporation concerning past operation.

In the agreement, Farr covenanted not to compete with PNI in the areas of surveillance, subrosa investigations, videotape recording, and sales, service and/or installation of security items. The covenant prohibited these activities by Farr in Idaho, Washington, Montana, Oregon, California, Utah, and Alaska for fifteen years. The sales contract also contained the following provision:

*Reliance.* The Buyers are not relying upon any other statements of the Sellers in regard to this transaction, except for those items which are listed above. The Buyers are relying upon their own judgment and that of their advisors as to the value of the Corporation, its ability to generate income, and the future costs of operation. The Sellers are hereby released of any claim as it concerns the fact that the Buyers' operation of the business does not prove to operate with the same costs or the same profit as has been derived by the Sellers. It is understood that much of the income from the business is attributable to the Sellers' operation and involvement in the business, and there may be clients and/or accounts which may not be continuing based upon the activities of the Buyers herein and continuing operating practices of the Corporation.

One of the listed items was a "corporate appraisal/value" of PNI conducted by Farr's accountant. This appraisal attributed $60,000 to PNI's "goodwill/ Going concern concept" and asserted these computations were justified by PNI's "excellent client list, many established contacts and an outstanding reputation in the Northwest."

Initially, Mischler operated PNI while Ramey remained in California. After Mischler finished closing out PNI's remaining investigative jobs, the respondents agreed that Ramey should remain in California until PNI's business generated enough income to support both of them. As time progressed the respondents became disappointed with what they felt was the lack of business PNI was generating. In an effort to develop PNI, the respondents began contacting attorneys and insurance companies in the area. After several discussions with local large users of worker's compensation investigators, the respondents discovered that PNI had no established clientele or customer base due to Farr's mismanagement of prior client relationships.

The respondents also discovered that Farr was operating another detective agency, Data Recovery Systems, Inc., in Coeur d'Alene. Data Recovery Systems was an investigative agency which Farr had incorporated, but let lapse, prior to and during his operation of PNI.

On July 9, 1992, after making six payments under the installment contract, the respondents refused to make further payments and offered to tender back PNI. As grounds for rescission, the respondents cited Farr's misrepresentation of PNI's goodwill and Farr's operation of Data Recovery Systems in violation of the covenant not to compete. Farr refused the tender and filed suit in district court seeking the balance due on the sales contract. The respondents placed all the files and other "non-weather sensitive" items in a storage facility. While waiting for Farr to retake possession of them, the remaining items and equipment, such as a computer, printer, fax, and photocopier, were used by the respondents in a new investigative entity called Patton, Mischler, and Ramey. This new entity continued to use PNI's phone number.

Approximately three weeks before trial, the respondents submitted the exhibits that they intended to use at trial. Seventeen of these exhibits were letters either to or from Farr concerning his prior relationships with clients. Farr made a motion in limine to exclude fourteen of the letters as not timely produced during the discovery process. The respondents asserted that they had just discovered the letters in the files that were placed in the storage facility. The district court gave Farr the choice of vacating the trial date or accepting admission of the exhibits. Farr elected to proceed to trial.

During trial, the respondents introduced a letter (Exhibit Q) Farr wrote to an attorney regarding a dispute between PNI and Houston General. During his trial testimony, Mischler read a portion of the letter which stated: "[i]f I am honest with the prospective buyers they may just pull out of the deal. If I am not honest with them about this situation, they would have a basis for an action against me in the future, I would think." Farr's trial attorney objected to the letter's admission as a privileged communication between Farr and his attorney. The district court overruled the objection.

Also during trial, the respondents' attorney examined Farr concerning his application to obtain a private detective license for Data Recovery Systems, Inc. Testimony was elicited that the application contained questions regarding whether the applicant had an arrest or conviction and that Farr had answered that question in the negative. Farr was then asked, "[i]sn't it true that you were in fact convicted of a felony back in the early 1970s?" Farr's attorney objected and the district court took up the matter outside of the jury's presence. When the jury reconvened the next morning the court stated, "Ladies and gentlemen, when we left off yesterday and you were let go, there was an objection made, I sustained the objection, and we will proceed from that point."

At the conclusion of the evidence, the jury found in favor of the respondents' counterclaim and that they were entitled to rescind the contract. Although no final judgment had been entered, Farr moved for a new trial based on the improper questioning as to Farr's felony conviction and the late submission of the letters. The district court denied the motion. In subsequent proceedings the district court awarded the respondents recovery of their purchase payments and storage expenses minus the accounts receivable and the fair market rental value of the PNI equipment they used. Farr moved for a judgment notwithstanding the verdict arguing that rescission was not available to respondents because their tender offer failed to include the $10,000 in accounts receivable and PNI's phone number. The district court denied this motion. Farr appealed.

## II.

## ISSUES PRESENTED

I. Whether the respondents promptly notified Farr of their intent to rescind the sales agreement once grounds for the right of rescission arose.

II. Whether the respondents fully tendered back PNI's assets.

III. Whether the violation of a covenant not to compete may give grounds for rescission.

IV. Whether the district court erred by submitting the issue of rescission to the jury.

V. Whether the district court abused its discretion by failing to exclude exhibits A through Q as not timely disclosed under I.R.C.P. 26.

VI. Whether the district court should have excluded exhibit Q as a privileged communication between client and attorney.

VII. Whether exhibits A through I should have been excluded as irrelevant.

VIII. Whether the sales agreement barred the misrepresentation claim.

IX. Whether an attempted impeachment concerning a prior felony prejudiced the jury.

## III.

## STANDARD OF REVIEW

 Farr appeals from numerous actions and orders of the district court. Generally, he appeals from denials of his motion for a judgment notwithstanding the verdict and motion for a new trial. This Court's standard of review regarding each motion is markedly different. When reviewing a motion for judgment n.o.v., this Court employs the same standard as that used by the trial court when ruling on the motion. The Court examines the record and draws all inferences from the evidence in the light most favorable to the non-moving party to determine if there was substantial evidence justifying the

submission of the case to the jury. *Spence v. Howell,* 126 Idaho 763, 769, 890 P.2d 714, 720 (1995). On the other hand, when reviewing the grant or denial of a motion for a new trial, this Court acknowledges the trial court's discretion in this regard. As a result, this Court will not disturb the trial court's decision unless such discretion was manifestly abused. *Id.* at 773, 890 P.2d at 724.

Any other standards of review will be discussed where applicable.

## IV.

## ANALYSIS

### A. Farr's Failure To Challenge The Timeliness Of The Notice Of Rescission Bars Him From Asserting It On Appeal.

■ Initially, Farr argues that the respondents' notice of intent to rescind the sales agreement was not timely given. Farr notes that the party seeking rescission must act promptly once the grounds for rescission arise. Once a party treats a contract as valid after the appearance of facts giving rise to a right of rescission, the right of rescission is waived. *Blinzler v. Andrews,* 94 Idaho 215, 218, 485 P.2d 957, 960 (1971). However, it is well accepted that issues not argued before the trial court will not be considered when raised for the first time on appeal. *Lawton v. City of Pocatello,* 126 Idaho 454, 464, 886 P.2d 330, 340 (1994). Because Farr never argued before the district court that the notice of rescission was untimely, we do not address this argument.

### B. Substantial Evidence Supports The Conclusion That The Respondents Fully Tendered Back PNI's Assets.

■ Farr's next contention is that the respondents failed to tender back all of PNI's assets. Farr alleges that the respondents' notice of rescission failed to tender back $10,000 in accounts receivable, that the respondents continued to use PNI's equipment

and phone number, and that the respondents kept PNI's client list for use in cultivating clients for their new business. Farr's contention that the tender was inadequate for failure to return PNI's client list appears to be somewhat inconsistent as Farr later argues that the sales agreement promised no goodwill or client base. It also ignores the fact that the respondents' misrepresentation claim is based on the lack of PNI's client base. Nonetheless, this argument was not raised at the trial court level and will not be considered. *Lawton,* 126 Idaho at 464, 886 P.2d at 340.

The notice of rescission stated that the respondents were tendering back "the assets of the business." A subsequent letter notified Farr that the respondents were still waiting for direction as to how to return "the assets and the corporate structure" and inquired how Farr wished to notify others that he had resumed control of PNI. When Farr refused the tender, the respondents placed all the "non-weather sensitive" items in a storage facility, but did admit to making use of some of PNI's equipment. The district court found that as to all these items the respondents made clear their intention to rescind the sales agreement and that they stood ready to deliver them to Farr whenever he desired. All of the items that Farr complains of are properly characterized as assets of the corporation.[1] Thus we hold that there was substantial evidence supporting the conclusion that the notice of rescission offered a full tender of the assets of the corporation.

Farr also argues that rescission is not a proper remedy because the respondents continued to use PNI equipment after giving notice of their intent to rescind the sales agreement. Once again, Farr did not raise this issue before the trial court and we will not address it. We note that rescission requires a restoration of the status quo. *Lewis v. Huff,* 125 Idaho 438, 443, 872 P.2d 701, 706 (1994). The district court appropriately com-

---

1. As for the telephone number, the record indicates that the phone number was not listed as an "asset" of the company in exhibit B of the sales agreement. A further indication that the phone number had a de minimis value is that when Farr did take possession of PNI he did not demand a return of the phone number even though the testimony indicates that the respondents stood ready to return it.

pensated Farr by awarding him the fair market rental value of the equipment used by the respondents both before and after the notice of rescission. By receiving back PNI's equipment and the fair market rental value of the equipment Farr has been placed back in the status quo. Thus, we conclude that the respondents fully tendered back the assets of the corporation and the record reflects that the parties were placed back to the status quo.

### C. Although A Violation Of A Covenant Not To Compete Would Not Give Rise To A Right To Rescind A Contract, The Existence Of Other Grounds For Rescission Supports The Judgment.

The respondents' notice of rescission cites Farr's breach of the covenant not to compete as a material breach of the sales agreement justifying rescission. The respondents argue that Farr's breach of the covenant not to compete, although not the core harm, further demonstrated Farr's misrepresentations and deceit in contracting with the respondents. We interpret this argument to be an admission that even if proven, the violation of the non-competition clause could not be grounds for rescission. Given our affirmance of the judgment below, Farr's actions regarding the non-competition clause do not affect the outcome of this case.

### D. Farr Failed To Object To The Submission Of The Rescission Issue To The Jury.

Farr challenges the manner in which the case was tried. In particular he argues that the court improperly submitted to the jury the question whether rescission, an equitable remedy, was available to the respondents. However, Farr never raised an objection to the submission of the rescission issue. A party who remains silent about presenting issues to a jury at trial is precluded from arguing on appeal that the use of the jury was inappropriate. *Hoppe v. McDonald,* 103 Idaho 33, 35, 644 P.2d 355, 357 (1982). In fact, in his argument on motion for judgment n.o.v., Farr argued not that the jury decided the rescission issue, but that "they decided it

wrongly." Accordingly, we do not address this issue.

### E. The District Court Did Not Abuse Its Discretion When It Concluded That Exhibits A Through Q Should Not Be Excluded Pursuant To Idaho Rule Of Civil Procedure 26.

 Farr argues that exhibits A though Q should be excluded because the respondents did not seasonably supplement interrogatories. *See, Gee v. State of Idaho,* 117 Idaho 107, 112, 785 P.2d 671, 676 (Ct.App. 1990). The imposition of discovery sanctions is within the discretion of the trial court and this Court will not overturn that decision absent a manifest abuse of that discretion. *Southern Idaho Prod. Credit Ass'n. v. Astorquia,* 113 Idaho 526, 528, 746 P.2d 985, 987 (1987). We review a discretionary ruling by the district court to ensure that it (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion in a manner consistent with applicable legal standards; and (3) reached its decision through an exercise of reason. *Lankford v. Nicholson Mfg. Co.,* 126 Idaho 187, 189, 879 P.2d 1120, 1122 (1994).

 Three weeks before trial, Farr made a motion in limine to exclude fourteen exhibits that the respondents proposed to use at trial. The exhibits consisted of letters either to or from Farr concerning past client relationships. At the hearing, Farr contended that the respondents were aware of the letters' existence as early as January of 1992 and that their failure to turn them over to Farr earlier in the discovery process warranted their exclusion from trial. In reaching its decision, the district court weighed the extent to which Farr was prejudiced by the respondents' allegedly late submission of the letters against the impact of keeping apparently relevant evidence from the trier of fact. In that regard, the following exchange between the district court and Farr's trial counsel occurred:

THE COURT: ... I'll tell you what I'm going to do. I'm going to give you a choice, either you vacate the trial or I'm going to deny the motion. What's more important to you? Because that tells me

how prejudicial this might be to the plaintiffs' case.

MS. JONES [Farr's trial counsel]: Your honor, my clients' instructions to me were that they want the trial to go forward.

THE COURT: I thought that. Motion in Limine will be denied, and we'll deal with the evidence as it comes forward.

We believe that the district court properly gave Farr the option of how to proceed. As a preliminary determination, the district court concluded that the letters were apparently relevant and should not be excluded. A proper remedy would have been to vacate the trial date to allow Farr to have more time to rebut the subject matter of the letters. *See, e.g., Viehweg v. Thompson*, 103 Idaho 265, 271, 647 P.2d 311, 317 (Ct.App. 1982) (court contemplating a discovery sanction should request an explanation of late disclosure, weigh the importance of the testimony, determine time needed to meet the testimony, and consider possibility of a continuance). The above exchange between court and counsel demonstrates that Farr did not consider the exhibits so prejudicial as to require that the trial date be vacated. *See, e.g., Wiseman v. Schaffer*, 115 Idaho 537, 539, 768 P.2d 800, 802 (Ct.App.1989) (finding no error in magistrate's admittance of testimony from a witness not timely disclosed to the opposing party where opposing party could show no specific prejudice arising from testimony). We conclude that the district court's decision to deny the motion in limine was a proper exercise of the court's discretion.

### F. The District Court Correctly Concluded That Exhibit Q Was Not A Privileged Communication Between Client And Attorney.

■ Farr argues that in Exhibit Q he sought legal advice from his attorney regarding a conflict between PNI and Houston General. In order for I.R.E. 502's attorney-client privilege to apply, the communication must be confidential within the meaning of the rule and made between persons described in the rule for the purposes of rendering legal advice. *See, State v. Allen*, 123 Idaho 880, 886, 853 P.2d 625, 631 (Ct.App. 1993). To be a confidential communication the communication must "not be intended to be disclosed to third persons." I.R.E. 502(a)(5). Farr's argument fails because he did not act in a manner indicating that the communication was to be confidential. The letter was kept in PNI's files, all of which were sold to the respondents as an asset of the corporation. Farr's failure to remove the letter constitutes a waiver of his privileged communication claim.

Farr cites to other jurisdictions which have held that the inadvertent production of privileged communications does not constitute a waiver of the right to claim them as privileged. *See, e.g., Transamerica Computer Co. v. International Business Machines Corp.*, 573 F.2d 646, 651 (9th Cir.1978); *PacifiCorp v. Dep't of Revenue*, 254 Mont. 387, 838 P.2d 914, 919 (1992). Without addressing the merits of such a proposition, we find those cases inapplicable to the matter at hand. The letter was not obtained in response to a voluminous discovery request. In fact, when Farr gave the letter to the respondents they were not opposing parties in litigation. We can find no reason for the application of an inadvertent discovery rule when the challenged document was not ordered to be produced, but rather was transferred as an asset of the corporation.

Because Farr failed to treat Exhibit Q as confidential, the district court correctly concluded that it should not have been excluded as a privileged communication.

### G. Exhibits A Through I Are Relevant.

Although a trial court has broad discretion regarding the admission of evidence, no such discretion exists regarding questions of relevance. As a result, the Idaho Supreme Court reviews such determinations *de novo*. *Mac Tools, Inc. v. Griffin*, 126 Idaho 193, 199, 879 P.2d 1126, 1132 (1994); *Holzheimer v. Johannesen*, 125 Idaho 397, 401, 871 P.2d 814, 818 (1994). We conclude that in a claim for misrepresentation of a business' prior client relationships letters detailing these past client relationships are relevant. We find no error in the district court's admission of them.

### H. The Sales Agreement Did Not Bar The Respondent's Misrepresentation Claim.

At the conclusion of the respondents' case, Farr moved for a directed verdict arguing that the unambiguous language of the sales agreement barred the respondents' misrepresentation claims. A directed verdict is proper only when the evidence is so clear that reasonable minds could find only for the moving party. *Lawton v. City of Pocatello*, 126 Idaho 454, 459, 886 P.2d 330, 335 (1994). In support of his argument Farr directs our attention to paragraphs five and ten of the sales agreement. Paragraph ten warns that PNI "has a customer base upon which the income has been derived from past work. No contracts exist with these customers for the continuation of services by the Corporation, and no guarantee is made by the Sellers these customers will continue their working relationship with the Corporation." Paragraph five, entitled "Reliance," releases the sellers from "any claim as it concerns the fact the Buyers' operation of the business does not prove to operate with the same profit as has been derived by the Sellers."

What Farr's argument fails to acknowledge is that paragraph five also declares that "[t]he Buyers are not relying upon any other statements of the Sellers in regard to this transaction, except for those items which are listed above." The items that paragraph five refers to and which the respondents were entitled to rely upon are contained within paragraph four, entitled "Sellers Representations." One of the documents listed in paragraph four is a CPA evaluation of the business. This evaluation attributes $60,000 to PNI's goodwill and going concern value. The evaluation then declares that these numbers were justified by PNI's "excellent client list, many established contacts and outstanding reputation in the Northwest."

In two places the sales agreement referred to the good will and going concern value of PNI. Paragraph ten, although not guaranteeing that any customers would continue to use PNI in the future, declared that "[t]he Corporation has a customer base." No matter what value is assigned to the tangible assets of PNI, it is clear that the respondents intended to purchase and Farr sold PNI for its goodwill and its value as a going concern. However, PNI's customer base and client list, if any, was a fact peculiarly within Farr's knowledge. In this regard, Farr testified as follows:

Q. Did you ever offer to let Mr. Mischler and Mr. Ramey see your client list before the close of this sale?

A. [by Farr]. Absolutely not. No way.

Q. Why would you not give Mr. Mischler and Mr. Ramey any opportunity under any circumstances to look at you client list prior to the sale?

A. ... that client list in total represented the heart of everything we did to the extent that if someone ... came up with a $5,000 nonrefundable earnest money with the idea of buying the company, if I had given them the clientele list, at that point they've got the brain center of my company for $5,000 rather than $80,000. And I spent ten years building up that business.

So, no, I was not about to let that list go until a deal was made. They saw everything else including the income and the equipment, that's all I was going to show them. . . .

Idaho has long stood by the rule announced in *Breshears v. Callender*, 23 Idaho 348, 131 P. 15 (1913) which stated:

Thus where the subject matter of the representation is a fact not peculiarly within the vendor's knowledge, but is one to which the purchaser has equal and available means and opportunity for information, and there are no confidential relations existing between the two, and no fraud or artifice is used to prevent inquiry or investigation, it is a general rule that the purchaser must make use of his means of knowledge and that, failing to do so, he cannot recover on the grounds that he was misled by the vendor.

*Id.* at 366, 131 P. at 22; *see also, Walker v. Nunnenkamp*, 84 Idaho 485, 490–91, 373 P.2d 559, 562 (1962); *Smith v. Johnson*, 47 Idaho 468, 472, 276 P. 320, 321 (1929). As Farr's testimony makes clear, this is not a case where the purchasers had "equal and

available means and opportunity for information." In two places the contract made reference to PNI's goodwill and going concern value. This is not a question of speculation as to value; the respondents' claim goes to the very existence of either a customer base or a client list. The only way for the respondents to investigate PNI's goodwill and going concern value would have been for them to see PNI's client list, which Farr would not permit. With no available means to investigate Farr's representations concerning PNI's customer base and client list, the respondents were forced to rely, and the sales agreement expressly allowed them to rely, on Farr's assertions, including the CPA report, regarding PNI's goodwill and going concern concepts. As a result, not only is the respondents' misrepresentation claim not barred by the sales agreement, but the sales agreement itself forms the basis of their misrepresentation claims.

## I. The Respondent's Attempted Impeachment Of Farr Did Not Prejudice The Jury.

Finally, Farr argues that the respondents' questioning of Farr about a felony conviction occurring some twenty years ago was improper, in violation of the procedure outlined in I.R.E. 609, and that the prejudicial effect of this improper question warrants a new trial. In denying Farr's motion for a new trial the district court recognized the issue as one of discretion and discerned no prejudicial impact. This Court defers to the trial court's determination regarding a new trial "unless the court has *manifestly* abused the wide discretion vested in it." *Quick v. Crane,* 111 Idaho 759, 770, 727 P.2d 1187, 1198 (1986). This deference is the result of the trial court's better position to view the trial and weigh the demeanor, credibility, and testimony of the witnesses, and the persuasiveness of all the evidence. Although we do not condone the questionable actions of the respondents in this regard, we hold that the district court was within the bounds of discretion granted to it in finding that the single question as to the prior wrongful act, immediately denied by Farr and coupled with the district court's corrective instruction, created no prejudicial impact requiring a new trial.

## V.

## CONCLUSION

We affirm the judgment below rescinding the sales agreement between Farr and the respondents. Several of Farr's arguments were not raised before the trial court, but were raised for the first time on appeal. As a result we do not address Farr's arguments that the respondents' notice of rescission was untimely, that the respondents did not fully tender back PNI's assets by failing to return a client list, that rescission is not a proper remedy in light of the respondents' use of PNI equipment after the notice of rescission had been given, and that the jury improperly decided the rescission issue.

We hold that the respondents' misrepresentation claims are not barred by the sales agreement and that substantial evidence supported the district court's conclusion that the respondents fully tendered back the assets of PNI. As for Farr's evidentiary concerns, we discern no error in the district court's decisions regarding the admission of exhibits A through Q generally, or exhibit Q specifically. We also hold that the impeachment of Farr concerning a prior felony conviction, immediately denied and coupled with a curative instruction, created no prejudice warranting a new trial.

Costs on appeal to respondent. No attorney fees on appeal.

McDEVITT, C.J., and TROUT and SCHROEDER, JJ., concur.

JOHNSON, Justice, concurring, concurring in the result, and dissenting.

I concur in all of the Court's opinion, except part IV(E) (concerning the admission of exhibits A through Q), part IV(H) (concerning the effect of the reliance section of the sale agreement), and part V (the conclusion).

I concur in the result of part IV(E). At the time of the hearing on the motion in limine the trial court did not have evidence that the buyers knew at an earlier time about the documents that were offered in evidence at trial as exhibits A through Q. This infor-

mation came to light during the trial, immediately before the exhibits were offered. Farr objected to their admission on the grounds of relevance, and did not reassert an objection concerning their late production. In my view, the motion in limine was properly denied because of the absence of evidence at that time of the buyers' knowledge of the exhibits earlier than their production. Farr's failure to reassert this objection to the admission of the exhibits during trial prevents him from now raising the issue based on the evidence presented in trial.

I respectfully dissent from part IV(H) of the Court's opinion. The sale agreement states:

4. *Sellers' Representations.* The Sellers have provided to the Buyers the following items for Buyers' review and inspection:

 a. Income tax return[s] for the last four (4) years;

 b. Profit and loss statements for the last four (4) years;

 c. Income statements for the last four (4) years;

 d. CPA evaluation of the business;

 e. List of the inventory and fixtures held by the Corporation, as described in Exhibit "B"; and

 f. Synopsis of operation costs for the last eighteen (18) months.

It is understood and agreed that the CPA evaluation of the business was based upon the above items which were given to the Buyers for their inspection. There is a business relationship between the CPA and the Sellers herein, and *the Buyers should, if they so desire, obtain the services of an independent CPA to make their own evaluation as to the Corporation's business and value.*

(Emphasis added).

The CPA evaluation, which was addressed to the corporation, stated:

For your information, I have made some computations to arrive at a fair market value for the company, Pacific Northwest Investigations, Inc., based on the assets and past financial statements.

*Following is a sampling of the various approaches that can be used to arrive at this value:*

| 1. | | |
|---|---|---|
| | Corporation and owners income | $ 35,000 |
| | FMV of assets | $ 45,000 |
| | Goodwill/Going concern concept | $ 60,000 |
| | | $140,000 |

| 2. | Five times gross receipts at a factor to represent expect return. (190,000 X 5 X .15) | $142,500 |
|---|---|---|

| 3. | Five times income. (35,000 X 5) | $175,000 |
|---|---|---|

To justify any of these computations, you must consider the fact that you have been in business several years, have an excellent client list, many established contacts and an outstanding reputation in the Northwest.

(Emphasis added).

Reading the caution about the buyers obtaining their own CPA evaluation of "the Corporation's business and value" together with the three approaches taken by the corporation's CPA in his evaluation and the language of the "Reliance" section of the sale agreement brings me to the conclusion that the buyers were not entitled to rely on the values contained in the CPA evaluation. In fact, the buyers paid only $90,000 for the corporation, far less than any of the values contained in the CPA evaluation. In my view the following words of the "Reliance" section of the sale agreement are dispositive:

The Buyers are relying upon their own judgment and that of their advisors as to the value of the Corporation, its ability to operate with an income, and the future costs of operation.

I conclude that the trial court should have granted Farr a directed verdict based on this language.