[No. 50234-0.  En Banc.  December 13, 1984.]

*In the Matter of the Marriage of* JUDITH HALL, *Respondent, and* PHILLIP L. HALL, *Petitioner.*

*Larry Setchell,* for petitioner.

*Chemnick & Moen,* by *Eugene M. Moen,* for respondent.

*Luvern V. Rieke* on behalf of the University of Washington School of Law, amicus curiae for respondent.

BRACHTENBACH, J.—Did the trial court err in this dissolution action in finding that the husband, a medical doctor in private practice, possessed goodwill valued at $70,000, but that the wife, a medical doctor employed as a salaried professor, did not possess goodwill? Secondarily, did the trial court apply the proper factors in valuing the husband's goodwill? By an unpublished split decision, the Court of Appeals affirmed. *In re Marriage of Hall,* 36 Wn. App. 1026 (1983). We reverse in part and remand for further proceedings.

Judith G. Hall, M.D., and Phillip L. Hall, M.D., were married in 1963 while medical school students. In 1966 both received their medical doctorates, served internships and pursued specialized training—Judith in pediatrics and Phillip in cardiology. Returning to Seattle in 1972, Judith was hired by the University of Washington Medical School as an assistant professor. Phillip entered private practice as

an internist employed by a private clinic.

At the time of trial, Phillip, age 41, enjoyed a good reputation in the community as a consulting cardiologist. In 1975, Phillip and another doctor formed a partnership, which was incorporated in 1977 as Northwest Cardiology Clinic. A third doctor became a shareholder in 1979. Three hospitals, as well as other doctors, referred patients to the clinic which was located on the campus of one of the hospitals. In the 3 years preceding trial, Phillip's average gross yearly earnings, exclusive of retirement contributions, were $52,411.83.

Judith, age 40 at the time of trial, was an untenured professor at the University of Washington with no expectation of tenure in the foreseeable future. In the 3 years preceding trial, Judith's average gross yearly earnings, exclusive of employer contributions to her retirement plan, were $32,750. In mid–1980 her salary increased to $42,000. Judith testified that her decision to pursue an academic career was primarily attributable to the need for a flexible schedule in order to care for the Halls' children. Although Judith is widely published and enjoys a reputation as one of the 10 top physicians in the nation in the field of pediatric genetics, there are few, if any, medical career opportunities outside academia, especially in the Seattle area. Numerous medical schools across the nation have offered her employment with salaries up to $60,000. Employment opportunities outside of academia with salaries in the range of $50,000 could be available with some retraining and relocation.

The trial court found that Judith had no professional goodwill due to the fact that she was a salaried physician. The court found that Phillip had professional goodwill in the amount of $70,000. A decree of dissolution was entered accordingly. The Court of Appeals affirmed the trial court's holdings; Phillip Hall petitioned for review.

Evaluation of professional goodwill is a troublesome issue. Since 1976, professional goodwill has been recognized in Washington as property of an intangible nature subject

to division in a marriage dissolution. *In re Marriage of Lukens*, 16 Wn. App. 481, 558 P.2d 279 (1976). It is often defined as the "expectation of continued public patronage". *Lukens*, at 483. Justice Story has more thoroughly defined professional goodwill as:

> a benefit or advantage "which is acquired by an establishment beyond the mere value of the capital, stock, funds or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices."

*Lukens*, at 483–84, citing *In re Marriage of Foster*, 42 Cal. App. 3d 577, 117 Cal. Rptr. 49 (1974).

In 1979, reviewing the decisions of other courts, this court noted that a number of states had refused, in a divorce proceeding, to assign a value to goodwill of a professional practice, but adopted the *Lukens* recognition of goodwill as a marital asset. *In re Marriage of Fleege*, 91 Wn.2d 324, 588 P.2d 1136 (1979). In *Fleege*, the issue was whether the goodwill of the husband's solo dental practice was a community asset. Despite expert testimony establishing that the value of his dental practice included goodwill, the trial court had refused to include goodwill as an asset subject to distribution. This court held that, although professional goodwill is not readily salable, the important consideration is not whether the goodwill of the practice could be sold without the personal services of the professional, but whether it has value to him. *Fleege*, at 327. The dissent contended that goodwill is not a marital asset subject to division because no true goodwill could exist separate and apart from the services of the practitioner. *Fleege*, at 330–36 (Stafford, J., dissenting).

Since *Fleege*, this court has not ruled further on the concept of goodwill. The Court of Appeals, however, applied the principles of *Fleege* to a case involving a lawyer in solo practice. *In re Marriage of Freedman*, 23 Wn. App. 27, 592

P.2d 1124 (1979) (*Freedman* I). In *Freedman* I, the trial court had included the lawyer's goodwill, valued at $100,000, in the community assets to be distributed. While adhering to *Fleege,* the Court of Appeals nevertheless remanded the case so that further testimony could be taken on all the factors set forth in *Fleege.* Although the existence of goodwill was not then at issue, the trial court, upon remand, found that goodwill could not exist in a solo law practice because it could not be sold. Instead, the trial court awarded the wife $19,451 as her "spouse's economic benefit expectancy" (SEBE). On a second appeal, the Court of Appeals did not analyze the nature of SEBE, nor did it consider the correctness of the trial court's finding of lack of goodwill. *In re Marriage of Freedman,* 35 Wn. App. 49, 51, 665 P.2d 902 (1983) (*Freedman* II). The Court of Appeals held that regardless of the name given, the trial court had considered the *Fleege* factors as required in *Freedman* I. Therefore, the award to the wife as SEBE was affirmed.

The last case to discuss professional goodwill was *In re Marriage of Kaplan,* 23 Wn. App. 503, 597 P.2d 439 (1979), which involved an attorney who was a "special partner" in a law firm. The trial court found that attorneys in general do not possess goodwill as an item of property. Alternatively, it found that even if attorneys in general do have goodwill, Mr. Kaplan did not. Relying on *Freedman* I, the Court of Appeals held that the legal question of whether an attorney has goodwill was foreclosed. The *Kaplan* court reversed and remanded for consideration of those factual elements used in determining the value of goodwill as discussed in *Fleege* and *Freedman* I.

The husband here contends that the *Fleege* doctrine should be reconsidered because (1) it presents confusing and unfair criteria for identifying and evaluating the economic benefit to one spouse or the other, from a professional degree and career; and, (2) it is unfair where, as here, it requires the determination that only one of two spouses, with identical professional educations and earning capaci-

ties, has professional goodwill. These contentions are based on the failure to distinguish between professional goodwill and personal earning capacity of the professional.

Goodwill is a property or asset which usually supplements the earning capacity of another asset, a business or a profession. Goodwill is not the earning capacity itself. It is a distinct *asset* of a professional practice, not just a *factor* contributing to the value or earning capacity of the practice. Comment, *Professional Goodwill in Louisiana: An Analysis of its Classification, Valuation, and Partition*, 43 La. L. Rev. 119, 123 (1982); 38 Am. Jur. 2d *Good Will* § 8, at 916 (1968). Discontinuance of the business or profession may greatly diminish the value of the goodwill but it does not destroy its existence. When a professional retires or dies, his earning capacity also either retires or dies. Nevertheless, the goodwill that once attached to his practice may continue in existence in the form of established patients or clients, referrals, trade name, location and associations which now attach to former partners or buyers of the practice. Comment, *Identifying, Valuing, and Dividing Professional Goodwill as Community Property at Dissolution of the Marital Community*, 56 Tul. L. Rev. 313, 320 (1981). Reference to Judge Reed's example in *Lukens*, at 485, illustrates the difference in that a professional can transport all of his skill (earning capacity) to a new town, but patients or clients, reputation and referrals (goodwill) cannot always be transported.

█ Once goodwill is distinguished from earning capacity, the error becomes apparent in the argument that a practicing professional and a salaried professional, with equal earning capacities and educations, both have goodwill. Both have earning capacities, and, yet, only the practicing professional has a business or practice to which the goodwill can attach. The practicing professional brings an earning capacity to the practice comprised of skill and education. The goodwill, comprised of such things as location, referrals, associations, reputation, trade name and office organization, can directly supplement this earning capacity.

When the practicing professional dies, retires or moves, he takes his skill and education with him, but the goodwill factors must be transferred or otherwise left behind. The goodwill may exist even though it is not marketable. *In re Marriage of Freedman,* 23 Wn. App. 27, 592 P.2d 1124 (1979).

The salaried professional also brings an earning capacity comprised of skill and education to the position. However, when the salaried professional leaves a position, he takes everything with him to the new position. There is nothing that increased his earning capacity in the old salaried position that cannot be taken to the new position.

The Court of Appeals and petitioner's expert witnesses distinguished between goodwill and earning capacity when they recognized that, by definition, a person working solely for a salary as an employee has no goodwill. We adopt the Court of Appeals holding and hold that as a matter of law a salaried employee such as Judith Hall cannot have goodwill.

We turn now to the matter of Phillip Hall's goodwill. When the Court of Appeals first recognized that the practice of a professional may include goodwill it looked to the California courts for guidance. The Court of Appeals in *In re Marriage of Lukens,* 16 Wn. App. 481, 558 P.2d 279 (1976) and the Supreme Court in *In re Marriage of Fleege,* 91 Wn.2d 324, 588 P.2d 1136 (1979) adopted both the holding of *In re Marriage of Lopez,* 38 Cal. App. 3d 93, 113 Cal. Rptr. 58 (1974) and the factors set out by that court for valuation of the goodwill. The factors: the practitioner's age, health, past demonstrated earning power, professional reputation in the community as to his judgments, skill, knowledge and his comparative professional success, have become known as the *Fleege* factors. Two areas surrounding the *Fleege* factors must be clarified: (1) the first step in evaluation under the *Fleege* factors is the determination of the existence of goodwill and (2) several accounting or appraisal methods may be used by the trial court in conjunction with the *Fleege* factors.

The *Lopez* court warned that evaluation of goodwill must be done with considerable care and caution. *Lopez,* at 110. In carrying out this warning the court instructed that the trial courts should first determine if goodwill exists in a particular practice. Not every professional business as a going concern necessarily has goodwill. *Lopez,* at 109. The Washington goodwill cases to date have not recognized this preliminary inquiry and we do so today. This preliminary inquiry takes place during the general evaluation process. The trial court must bear in mind throughout this process that there may be zero goodwill.

The *Fleege* factors, under which the determination of existence and evaluation are made, give little guidance to the trial courts. Although we continue to require their usage when appropriate, *i.e.,* when those factors are present, during valuation of goodwill, we now recognize various methods which may be used in conjunction with these factors. The *Fleege* factors cannot be evaluated and valued in isolation. One or more of the accepted methods of valuation must be employed. The particular method used by the trial court will depend on the offered proof. Because evidence available to the court varies greatly from case to case, selection of any one method for all cases would unnecessarily limit the court in making a fair and just distribution.

In valuing goodwill five major formulas have been articulated. *See generally* Comment, *Identifying, Valuing, and Dividing Professional Goodwill as Community Property at Dissolution of the Marital Community,* 56 Tul. L. Rev. 313 (1981); Comment, *The Recognition and Valuation of Professional Goodwill in the Marital Estate,* 66 Marq. L. Rev. 697 (1983); Dlugatch & Olds, *Determining Goodwill in a Professional Practice for Purpose of a Community Property Division in a Marital Dissolution,* 9 Community Prop. J. 120 (1982). There are three accounting formulas. Under the straight capitalization accounting method the average net profits of the practitioner are determined and this figure is capitalized at a definite rate, as, for example, 20 per-

cent. This result is considered to be the total value of the business including both tangible and intangible assets. To determine the value of goodwill the book value of the business' assets are subtracted from the total value figure.[1]

The second accounting formula is the capitalization of excess earnings method. Under the pure capitalization of excess earnings the average net income is determined. From this figure an annual salary of average employee practitioner with like experience is subtracted. The remaining amount is multiplied by a fixed capitalization rate to determine the goodwill.[2]

The IRS variation of capitalized excess earnings method takes the average net income of the business for the last 5 years and subtracts a reasonable rate of return based on the business' average net tangible assets. From this amount a comparable net salary is subtracted. Finally, this remaining amount is capitalized at a definite rate. The resulting amount is goodwill.[3]

The fourth method, the market value approach, sets a value on professional goodwill by establishing what fair price would be obtained in the current open market if the practice were to be sold. This method necessitates that a

---

[1] 
| | |
|---|---|
| Average net earnings | $60,000 |
| Capitalize at 20% | x 5 |
| Total business tangible and intangible assets | 300,000 |
| Less current net tangible assets | –30,000 |
| Goodwill | $270,000 |

[2] 
| | |
|---|---|
| Average net earnings | $60,000 |
| Less comparable net salary | –40,000 |
| Average earnings on intangible assets | 20,000 |
| Capitalize at 20% | x 5 |
| Goodwill | $100,000 |

[3] 
| | |
|---|---|
| Average net earnings | $60,000 |
| Less rate of return on average tangible assets | –2,500 |
| Subtotal | $57,500 |
| Less comparable net salary | –40,000 |
| Average earnings on intangible assets | 17,500 |
| Capitalize at 20% | x 5 |
| Goodwill | $87,500 |

professional practice has been recently sold, is in the process of being sold or is the subject of a recent offer to purchase. Otherwise, the value may be manipulated by the professional spouse.

The fifth valuation method, the buy/sell agreement method, values goodwill by reliance on a recent actual sale or an unexercised existing option or contractual formula set forth in a partnership agreement or corporate agreement. Since the professional spouse may have been influenced by many factors other than fair market value in negotiating the terms of the agreement, courts relying on this method should inquire into the presence of such factors, as well as the arm's length nature of the transaction.

These five methods are not the exclusive formulas available to trial courts in analyzing the evidence presented. Nor must only one method be used in isolation. One or more methods may be used in conjunction with the *Fleege* factors to achieve a just and fair evaluation of the existence and value of any professional's goodwill.

The danger of using any one method without regard to the *Fleege* factors is apparent in the present case where petitioner's expert witnesses used only the capitalized excess earnings approach. Under this approach the experts testified that Phillip had no goodwill. Further testimony, however, indicated that Phillip's comparatively low earnings were a result of office expansion expenses, a deliberate decision to limit hours of practice and failure to compare Phillip with cardiologists in the same age and experience group doing similar procedures in Seattle. Consideration of the petitioner's reputation, associations, referrals, location and trade name indicate the existence of goodwill.

This case also exemplifies the need for caution in the use of the buy/sell agreement. The Northwest Cardiology Clinic buy/sell agreement does not include a goodwill factor. When the third doctor became a shareholder, no value was assigned to goodwill. The trial court must, however, inquire whether the omission in the agreement was the result of other factors or deliberations on the part of the sharehold-

ers, particularly when the particular agreement is made in close proximity in time to the divorce.

Although an analysis of the evidence suggests the existence of goodwill in Phillip's practice, there is insufficient evidence as to the court's valuation of $70,000. Valuation of goodwill is a question of fact, *Suther v. Suther*, 28 Wn. App. 838, 627 P.2d 110, *review denied*, 95 Wn.2d 1029 (1981). Findings of fact supported by substantial evidence in the record will not be reversed on appeal. *Trans–Canada Enters., Ltd. v. King Cy.*, 29 Wn. App. 267, 271, 628 P.2d 493, *review denied*, 96 Wn.2d 1002 (1981). Substantial evidence is evidence sufficient to persuade a fair–minded person of the truth of the declared premise. *Smith v. Shannon*, 100 Wn.2d 26, 666 P.2d 351 (1983); *Ridgeview Properties v. Starbuck*, 96 Wn.2d 716, 638 P.2d 1231 (1982).

The trial court found that Phillip had goodwill in the amount of $70,000 "based on the court's evaluation of the factors involved in determining goodwill". The court failed, however, to indicate what factors and method were used in valuation and, in fact, noted in its oral ruling:

> I am not going to go over all of my reasons. I have simply been persuaded that it exists in the consideration of the status of the practice.

Report of Proceedings, at 129.

The record with regard to Phillip Hall's goodwill consists of the testimony of petitioner's expert witnesses and Judith Hall, and the accounting records of Phillip's earnings and tangible business assets. Petitioner's experts, an accountant and an economist, testified that based solely on the capitalized excess earnings approach, Phillip has no goodwill. Judith testified that based on other dissolution actions involving physicians, Phillip's goodwill is at least $100,000. Judith's testimony was the only evidence which assigned value to Phillip's goodwill. Her value was not based upon any analysis or upon application of any recognized valuation methodology. Nonetheless, it came in without objection. We, therefore, express no opinion as to its admissibility.

The evidence set forth in the record is insufficient to support the finding that Phillip has $70,000 worth of goodwill. The unsubstantiated opinion of Judith and the records of Phillip's earnings and tangible assets are insufficient, without further analysis by the trial court, to persuade a fair-minded person that the $70,000 figure is the true value of Phillip's goodwill. The trial court must set forth on the record which factors and method were used in reaching its finding. We, therefore, reverse and remand for further findings by the trial court in accordance with the valuation guidelines set forth herein.

Petitioner also raises the issue of the proper method of analyzing the future earning potential that Judith Hall has gained during marriage. Petitioner contends that the increase in earning potential, as evidenced by Judith's numerous published writings, her excellent reputation in her field and recent job offers, is an asset so similar to goodwill that it should be considered to offset his goodwill.

Although treatment of future earning capacity as a distinct marital asset has been advocated, *see* Comment, *A Property Theory of Future Earning Potential in Dissolution Proceedings,* 56 Wash. L. Rev. 277 (1981), this court has declined to treat it as such. Recently, we have emphasized future earning capacity as a factor to be considered in property distribution in the context of professional degrees. *In re Marriage of Washburn,* 101 Wn.2d 168, 677 P.2d 152 (1984). In *Washburn,* we discussed a line of cases which view the professional degree (or the enhanced earning potential which it represents) as property, to be valued and distributed upon dissolution of marriage; as nonproperty, but as a factor deserving of a restitutionary award; as nonproperty to be considered in alimony; and as nonproperty deserving of no compensation. *Washburn,* at 174–75.

As we held in the context of professional degrees, we now hold that the provisions of our dissolution of marriage act, codified in RCW 26.09, provide for a fair and just treatment of future earning potential. RCW 26.09.080 reads in part:

> In a proceeding for dissolution of the marriage, legal separation, . . . the court shall, without regard to marital misconduct, make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all relevant factors including, but not limited to:
>
> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage; and
> (4) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse having custody of any children.

In addition to the four subsections in RCW 26.09.080, which include "[t]he economic circumstances of each spouse at the time the division of property is to become effective," the court should also consider the age, health, education and employment history of the parties and their children, and the future earning prospects of all of them in determining a just and equitable division. *DeRuwe v. DeRuwe,* 72 Wn.2d 404, 408, 433 P.2d 209 (1967); *In re Marriage of Rink,* 18 Wn. App. 549, 551, 571 P.2d 210 (1977). In *Washburn* we also emphasized the importance of the future earning potential of each spouse by setting it out as one of four factors to be considered in determining the proper amount of compensation for the supporting spouse.

Once again we emphasize the importance of consideration of future earning potential. We decline to find that future earning potential is an asset which can be used to offset goodwill. Instead, we hold that it is a substantial factor to be considered by the trial court in making a just and equitable property distribution. On remand, the trial court should articulate its reasoning in taking into account this substantial factor.

WILLIAMS, C.J., UTTER, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.