971 P.2d 734

**John E. McAFFEE, Plaintiff–Respondent,**

v.

**Joann McAFFEE, Defendant–Appellant.**

No. 23822.

Court of Appeals of Idaho.

Jan. 5, 1999.

Swafford Law Office, Chtd., Idaho Falls, for appellant.

Hopkins, Roden, Crockett, Hansen & Hoopes, Idaho Falls, for respondent.

PERRY, Chief Judge.

In this action, we are asked to review the division of property issued by the magistrate in a decree of divorce. We are also asked to review the magistrate's order of clarification and correction which followed the district court's remand on intermediate appeal from the magistrate. For the reasons set forth below, the magistrate's divorce decree, including the order of clarification and correction, is affirmed in part, vacated in part and remanded for further proceedings.

## I.

## BACKGROUND

John E. McAffee and JoAnn McAffee were married June 5, 1982. The parties separated on or about June 8, 1992, and John filed for divorce on September 10, 1992. A trial was held in March 1994.

There were many disputed issues at trial, including the value of the parties' stock in Western Catering, Inc. and their percentage of ownership in that closely-held business. The parties also disputed numerous other issues, including the value and characterization of debts and assets.

The magistrate issued its divorce decree and an order dividing the parties' property. Both parties appealed the magistrate's determination to the district court. The magistrate's division of property was affirmed in part, reversed in part, and remanded. Subsequently, John moved for a modification of the magistrate's findings based on the district court's remand on the intermediate appeal. The magistrate issued an order of clarification and correction. JoAnn appeals.

## II.

## STANDARD OF REVIEW

Our review of a magistrate's decision is made independently from, but with due regard for, the decision of a district court sitting in an appellate capacity. *Worzala v. Worzala,* 128 Idaho 408, 411, 913 P.2d 1178, 1181 (1996); *Smith v. Smith,* 124 Idaho 431, 436, 860 P.2d 634, 639 (1993). The magistrate's findings of fact will be upheld if they are supported by substantial and competent evidence. *Worzala,* 128 Idaho at 411, 913 P.2d at 1181; *Smith,* 124 Idaho at 436, 860 P.2d at 639. In this case, our review encompasses both the magistrate's decree of divorce and the magistrate's order of clarification and correction on remand.

## III.

## DISCUSSION

### A. Western Catering, Inc.

#### 1. Ownership

One of the disputed issues at trial was the parties' ownership in Western. Western was incorporated in 1988. Initially, of the one hundred issued and outstanding shares, forty-nine shares were held in John's name and one in JoAnn's name. The other fifty shares were owned by Tom O'Dell and Sheila O'Dell. Western had a contract with the United States Forest Service to provide food service during forest fires. The contract was

to expire on May 31, 1994, two months after trial. At the time of trial, it was uncertain whether Western would be awarded another contract. John testified that five of his shares were "redeemed" by the corporation to enable the company to be considered "lady-owned," thereby enhancing Western's prospect of receiving the Forest Service contract. John and Tom O'Dell both testified that the redemption was done informally. In addition, John testified that the five redeemed shares were offered to Western's accountant, Glenn Ritter, and his wife, Joan Ritter. Glenn Ritter, however, testified that he and his wife did not own any Western stock at the time of trial. Glenn Ritter further testified that Western had offered him shares of the company, but he had not yet accepted the offer. Plaintiff's exhibit 26, a letter written by Sheila O'Dell as president of Western, dated February 4, 1994, detailed the ownership of Western:

On 1/18/94 Ownership of Western Caterers['] Stock was listed as follows:

| | |
|---|---|
| Sheila ODell | 49 Shares |
| John McAffee | 44 Shares |
| Joan Ritter | 4 Shares |
| Glenn Ritter | 1 Share |
| Joann McAffee | 1 Share |
| Tom ODell | 1 Share |

John and Glenn Ritter both testified that John's five shares were also redeemed to equalize the obligations that the McAffees and O'Dells owed to Western for advances or loans made to them by the corporation. These obligations were carried on the corporate books as "notes receivable." At the end of fiscal year 1993, the McAffees' obligation was $41,501.63 and the O'Dells' was $24,540.20. John was also going to contribute an asset referred to as the "shower trailer" to Western to partially rectify the difference.

■ The magistrate found that "regardless of whether or not the five (5) percent stock transfer was completed and in a procedurally lawful manner, the stock transfer is in lieu of payment of certain debts. It economically benefits the community and therefore does not abrogate [JoAnn's] community property rights."

1. *See infra* section III.A.2.

On appeal, JoAnn contends that the magistrate erred in concluding that JoAnn's community property rights were not abrogated. First, she contends that in reality there was no debt to the corporation to be discharged by the stock redemption. The advances from the corporation were draws, she asserts, and therefore were income to the McAffees, not loans. JoAnn also asserts that there was no finding as to the value of the stock allegedly transferred by John to Western. Even if there was a debt, she contends that there was an overcompensation because the shower trailer by itself would have substantially equalized the debt. Thus, JoAnn alleges that the redemption of the five shares overcompensated the corporation and significantly reduced the community estate.

The magistrate found that the McAffees' withdrawals created an obligation to the corporation and that the difference in the obligations of the McAffees and the O'Dells was $16,961.43. This finding is supported by the testimony of the corporation's accountant. The magistrate also found that to equalize the difference between the obligations of the McAffees and the O'Dells, five shares of Western's stock were redeemed. At the time of trial and in accordance with the magistrate's valuation of Western in the amount of $135,433.94,[1] five of the one hundred issued and outstanding shares of Western equaled $6,771.70. Adding the shower trailer's value of $2,000, which was stipulated to in a joint exhibit, brings this sum to $8,771.70, well below the actual difference in the obligations. Although JoAnn now values the trailer at $17,000, the evidence demonstrates that her valuation includes $15,000 worth of improvements paid for by Western and included in the valuation of the Western stock.

Based on our review, we conclude that there was conflicting evidence as to whether a stock redemption occurred. Nonetheless, we agree with the magistrate that if the redemption was actually completed, the stock transfer was in lieu of payment of certain community debts which created a net economic benefit to the community. JoAnn's community property rights were therefore

not abrogated or compromised. The magistrate's findings in this regard are supported by substantial and competent evidence, and we find no error.

## 2. Valuation

At trial, JoAnn called Don Cain, an appraiser who performed a business valuation of Western. Cain testified at length to his valuation of Western, which he classified as an "income approach." Using his methodology, as reflected in his updated appraisal for the 1993 fiscal year, Cain capitalized Western's net income (using the average of net income over several years) and arrived at an estimated value of the business. Cain then added to this amount the value of the tangible assets for a total estimated value of the business, exclusive of land and other building values. On rebuttal, John presented the testimony of Brent Thompson, also an appraiser. Thompson criticized Cain's approach, concluding that Cain erred both in his capitalization rate and in re-including the tangible assets after capitalizing the income.

Finding it flawed, the magistrate declined to follow Cain's income approach. The magistrate considered valuing Western based on the capitalized excess earnings method as stated in *Olsen v. Olsen*, 125 Idaho 603, 873 P.2d 857 (1994). The magistrate, however, found that Western currently had "no income, no 'excess income' and no profit to capitalize," and that Western was not presently a going concern. The magistrate therefore valued Western at $135,433.94 based solely on the net fair market value of the tangible assets.[2]

JoAnn claims the magistrate erred in finding that Western had no income, no excess income and no profit to capitalize. JoAnn also contends that the magistrate erred in concluding that Western was not a going concern and in valuing the company without including goodwill. JoAnn asserts that under *Olsen* the magistrate should have valued Western using the capitalized excess earnings method which Cain employed in ascertaining Western's value.

 Goodwill is an appropriate factor in determining the value of a business. *Olsen*, 125 Idaho at 606, 873 P.2d at 860. The goodwill of a business "is the custom which it attracts, and the benefits or advantage it receives from constant or habitual customers, and the probability that the old customers will continue to come to the place." *Harshbarger v. Eby*, 28 Idaho 753, 761, 156 P. 619, 621 (1916), *quoting Johnson v. Friedhoff*, 7 Misc. 484, 27 N.Y.S. 982, 982 (1894). The determination of whether a business has goodwill is a question of fact. *Moffitt v. Moffitt*, 813 P.2d 674, 676 (Alaska 1991); *See also In re Marriage of Hall*, 103 Wash.2d 236, 692 P.2d 175, 179 (Wash.1984).

 The capitalization of excess earnings is one method of determining the value of goodwill in a business.[3] *Olsen*, 125 Idaho at 606, 873 P.2d at 860; *Hall*, 692 P.2d at 179. *See also* SHANNON P. PRATT, VALUING SMALL BUSINESSES AND PROFESSIONAL PRACTICES, Ch. 15 (2d ed.1993); AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, SMALL BUSINESS CONSULTING PRACTICE AID NO. 8, VALUATION OF A CLOSELY HELD BUSINESS 13–14 (1987). Utilizing this method, certain adjustments must first be made to the earnings of the business. Next, to determine excess earnings, a reasonable return on the net tangible assets must be subtracted from the adjusted earnings of the business. In addition, if the business is a sole proprietorship or partnership, a reasonable salary for the owner must also be subtracted. *See e.g. Olsen*, 125 Idaho at 606, 873 P.2d at 860 (In valuing a business in a divorce case, the husband's comparable salary was deducted from the net income of

---

**2.** In valuing the corporation, the magistrate did not include the value of the "notes receivable" debts allegedly owed by the McAffees and the O'Dells. However, neither party posits that this omission was error.

**3.** The capitalization of excess earnings method, also known as either the formula or treasury method, was promulgated by the United States Treasury Department in a 1920 publication and was updated and restated by the Internal Revenue Service in Revenue Ruling 68–609. SHANNON P. PRATT, VALUING SMALL BUSINESSES AND PROFESSIONAL PRACTICES 212 (2d ed.1993). *See* Rev. Rul. 68–609, 1968–2, C.B. 327.

the business to compute the excess earnings.). The excess earnings of the business are then capitalized and the resulting amount is considered goodwill. This amount is added to the adjusted net tangible assets to arrive at a total value of the business.

■ Another capitalization method in valuing a business is a straight capitalization of earnings. *Hall,* 103 Wash.2d 236, 692 P.2d 175, 179 (Wash.1984). *See also* AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, SMALL BUSINESS CONSULTING PRACTICE AID NO. 8, VALUATION OF A CLOSELY HELD BUSINESS 12 (1987). Under this method, the earnings from prior years are capitalized to arrive at a total value of the business. This value includes both tangible and intangible assets. Goodwill is included within this valuation.

■ JoAnn has characterized Cain's valuation of Western as capitalization of excess earnings. We note, however, that Cain did not subtract a reasonable return on Western's net tangible assets in arriving at his excess earnings value for the business. Thus, Cain's income approach was more akin to a straight capitalization of earnings, not capitalization of excess earnings. Consequently, assuming Cain's figures, assumptions and capitalization rate were not in error, his resulting amount was the total value of the business, including both tangible and intangible assets. Cain's formula incorporated the value of the tangible assets twice. For these reasons, the magistrate did not err in finding Cain's methodology for the valuation of Western flawed and in declining to adopt Cain's valuation of Western.

■ As discussed, JoAnn sought to establish Western's value, which included an amount above the value of the net tangible assets, using an income approach referred to as the capitalization of excess earnings. There was, however, conflicting evidence whether Western had a positive net income which could have been capitalized. Moreover, there was conflicting evidence whether Western was a going concern, *i.e.* a viable business entity. In its analysis, the magistrate considered Western's contract with the Forest Service. At the time of trial, the Forest Service contract was near its expiration. There was no certainty that Western would be granted another contract because numerous competitors were also bidding for the next contract. As noted by the magistrate, without a contract, Western would have no business. Even if Western received another contract with the Forest Service, Western's future was also dependent upon the existence of forest fires. Based on past history, the existence of forest fires in Western's contract area was speculative. The evidence adduced at trial indicated that Western, except for the 1991–1992 fiscal year, was not profitable. In the 1993–1994 fiscal year, there were relatively few fires, Western's losses were substantial, and Western was unable to repay its operating loan. The magistrate thus valued Western based upon the net fair market value of its tangible assets exclusive of goodwill.

■ In a divorce proceeding, the magistrate, not this Court on appeal, resolves the conflicting evidence and determines the weight, credibility and inferences to be drawn from such evidence. *Weilmunster v. Weilmunster,* 124 Idaho 227, 238, 858 P.2d 766, 777 (Ct.App.1993). On review, we conclude that there was substantial, although conflicting, evidence to support the magistrate's finding that Western had "no income, no 'excess income' and no profit to capitalize." We also conclude that there was substantial, although conflicting, evidence to support the magistrate's finding that Western was not a going concern. We therefore hold that the magistrate did not err in its valuation of Western.

### 3. O'Dell Property

■ In JoAnn's valuation of Western, she also included property referred to as the O'Dell property. Apparently, the deed to this property was in Western's name, but the O'Dells maintained their private residence on the property. Tom O'Dell testified that the property had been inappropriately deeded to the corporation. John challenged JoAnn's contention, alleging that the O'Dell property should be excluded from Western's valuation. In determining the ownership of the O'Dell

property for this proceeding, the magistrate noted that the deed to the property was in Western's name. The magistrate, however, considered the totality of the circumstances and found:

1. The O'Dell's paid for the property—not the corporation;

2. O'Dell's continue to be in exclusive possession and control of the property. The corporation does not use the property; it is the private home and premises of Tom and Sheila O'Dell. The corporation's registered address and principal place of business is Arco, Idaho, and the corporation's equipment and assets (with few exceptions) are kept and stored in Arco, Idaho;

3. O'Dell's pay the taxes and insurance on the subject property, not the corporation;

4. The corporation has not carried this property on its books, records and depreciation schedules;

5. O'Dell's have made improvements to the property at their own expense; and

6. O'Dell's have traded, exchanged and sold certain parcels of the property without involvement by the corporation.

There is no evidence that improvements on the property, including a mobil[e] home and a storage facility, are owned by the corporation....

*The Court concludes that the corporation does not own the O'Dell property and should give a quitclaim deed thereon to the O'Dell's to clear title.*

■■■ On appeal, JoAnn contends that Western holds title to the O'Dell property and that the magistrate erred in excluding the property from Western's valuation. Under Idaho law, there arises a rebuttable presumption that the holder of title to property is the legal owner of that property. *Hettinga v. Sybrandy,* 126 Idaho 467, 469, 886 P.2d 772, 774 (1994); *Russ Ballard & Family Achievement Inst. v. Lava Hot Springs Resort, Inc.,* 97 Idaho 572, 579, 548 P.2d 72, 79 (1976). A rebuttable presumption imposes upon the party against whom it operates the

burden of going forward with evidence to rebut the presumption. I.R.E. 301.

The magistrate considered the evidence and found that under "all other circumstances and 'indicia' of ownership," the deed was not controlling and that the corporation did not own the O'Dell property. *See Shurrum v. Watts,* 80 Idaho 44, 53, 324 P.2d 380, 385 (1958) ("Where title to property is taken in the name of one party but the consideration is paid by another, a resulting trust arises in favor of the party who pays the consideration."). On review, we conclude that the magistrate's findings are supported by substantial and competent evidence.

JoAnn also contends that it was error for the magistrate to require Western, not a party to this action, to execute a quitclaim deed to the O'Dells. As correctly perceived by the district court, the magistrate's "suggestion is not enforceable against Western." The effect of the magistrate's conclusion was only that, *for the purpose of this action,* the corporation did not own the property. Therefore, we find no error.

### 4. Pence Property

Another disputed issue at trial was the valuation of the "Pence property" owned by Western. JoAnn contended the Pence property consisted of 312 acres. Cain appraised the property at $300 per acre and assessed a valuation of $93,500. At trial, JoAnn offered Cain's appraisal report into evidence. The magistrate sustained the objection and denied introduction of the appraisal report. However, the report was placed in the record as an "offer of proof." The magistrate valued the property, which it found consisted of only 292 acres, at $150 per acre for a value of $43,800.

### a. Discovery violation

■■■ JoAnn asserts that the magistrate abused its discretion in excluding her expert's appraisal of the Pence property because of its late disclosure.[4] The imposition of discovery sanctions is within the discretion of the trial court, and an appellate court will

---

4. JoAnn also asserts that the magistrate abused its discretion in refusing to admit JoAnn's expert appraisal regarding the O'Dell property. Based on our decision regarding the O'Dell property, *see supra* section III.A.3, it is unnecessary for us to address this issue.

not overturn that decision absent a manifest abuse of that discretion. *Farr v. Mischler,* 129 Idaho 201, 206, 923 P.2d 446, 451 (1996). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the court reached its decision by an exercise of reason. *Sun Valley Shopping Center, Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

We note that the magistrate, although excluding Cain's appraisal report as an exhibit, considered the content of the report which was in the record as an offer of proof. The magistrate, in its division of property, commented at length on Cain's opinions in conducting its analysis in valuing the Pence property. Thus, although the exhibit was not admitted, the magistrate nonetheless considered it as evidence. Under these circumstances, we fail to see how JoAnn has been prejudiced by the magistrate's refusal to formally admit the exhibit. *See* I.R.C.P. 61.

JoAnn also contends that the magistrate was not consistent in sanctioning the parties for late disclosure. She alleges that the magistrate excluded two of her exhibits based on late disclosure, yet permitted Thompson, John's expert, to testify although he was disclosed to the defense after the discovery deadline. We are unpersuaded. First, the substance of Thompson's testimony was verbally disclosed to JoAnn on the discovery deadline date and this verbal disclosure was followed up with a letter the following week. JoAnn, by contrast, disclosed the results of Cain's appraisals the weekend before trial. Second, the magistrate allowed both parties' experts to testify. Finally, John's expert was called only as a rebuttal witness to impeach Cain's testimony concerning his valuation of Western. Cain's appraisal reports, on the other hand, were offered by JoAnn as direct evidence. Based on our review, we conclude that the magistrate did not commit reversible error in sanctioning the parties for discovery violations.

### b. Valuation

JoAnn also alleges that the magistrate erred in its valuation of the Pence property. The magistrate found that the Pence property owned by Western consisted of 292 acres of unimproved real estate in Custer County; but that the adjacent 20 acres was not an asset of Western. Tom O'Dell's testimony supports the magistrate's finding that Western did not own the adjacent 20 acres received by O'Dell in an exchange. Thus, we conclude that this finding is supported by substantial and competent evidence.

The magistrate also found that the 292 acres had a fair market value of $150 per acre. The magistrate rejected Cain's opinion of $300 per acre (received as an "offer of proof") because Cain predicated his appraisal of the property on the following future assumptions:

1. The eventual paving of Trail Creek Road which would connect the property with the Sun Valley area all year around;

2. The property's potential for development;

3. The fact that the property could be irrigated;

4. The property had a current best use as a pasture.

The magistrate correctly recognized that the value of community property is determined at the date of divorce. *Desfosses v. Desfosses,* 120 Idaho 354, 358, 815 P.2d 1094, 1098 (Ct.App.1991). While present value may reflect reasonably foreseeable future uses and changes in neighboring properties, the weight assigned such evidence is committed to the trier of fact. The magistrate's finding that the Pence property was undeveloped, remote, non-income producing sagebrush ground, with uncertain water rights, supports the valuation of $150 per acre.

Therefore, the magistrate's valuation of the Pence property at $43,800 is supported by substantial and competent evidence.

## B. Ken McAffee Farm

The parties further disputed the ownership of seventy acres of land and a farm known as the Ken McAffee farm. After Ken McAffee purchased the farm in 1988, he developed health problems and could no longer manage it. According to testimony at trial, Ken agreed to sell the farm to John and JoAnn, "if they paid for it." John testified that the property was being leased. The magistrate found that the parties did not pay for it and that the farm was not to be included in the community.

JoAnn argues that the magistrate erred in finding that the community did not own the Ken McAffee farm under an oral sales contract. JoAnn requests that we reverse the magistrate and "order that the Ken McAffee property is in fact community property of the parties and that the debts associated with such property as well as the equity, if any, be the joint responsibility and property of the parties."

The magistrate found that a "sale transaction had never occurred" between the parties and Ken McAffee, and that the community possessed only an "economic opportunity." To realize this "economic opportunity" the magistrate stated that the community would have to do the following:

1. Create a written agreement sufficient to comply with I.C. § 9–503;

2. Repay Ken McAffee for his down-payment;

3. Reimburse Ken McAffee for his FmHA payments;

4. Reimburse Ken McAffee for property tax payments;

5. Pay the annual FmHA payment that was delinquent;

6. Pay the then delinquent Butte County property taxes;

7. Assume and make the remaining FmHA mortgage payments.

The magistrate then found that the parties were "in no position to realize this economic opportunity" due to other existing financial obligations, several community property debts (all past due), contingent tax liabilities and extraordinary attorney fees and legal costs.

The magistrate's finding that a sales transaction never occurred is essentially a finding that there was no oral or written bilateral contract for the sale of the Ken McAffee farm. What the magistrate characterizes as an "economic opportunity," may be better characterized as an offer of a unilateral contract. Ken McAffee's offer to sell the farm to the parties, "if they pay for it" may have been an offer of a unilateral contract, which was not enforceable against the parties by Ken McAffee, nor created any rights in the parties until they completed their performance. *See Deer Creek, Inc., v. Clarendon Hot Springs Ranch, Inc.,* 107 Idaho 286, 291, 688 P.2d 1191, 1196 (Ct.App.1984). Finding no enforceable contract in fact, the magistrate did not need to reach the issue of whether the statute of frauds prohibited enforcement of an oral agreement to transfer an interest in real property, or whether there was part performance taking the oral agreement out of the statute of frauds.

Furthermore, we note that Ken McAffee is not a party to this divorce action. JoAnn cannot force determination of Ken's contested ownership rights in the property within this action by ordering *Ken* to set over his property to the community. In so deciding, we make no indication as to whether the community has any legal recourse against Ken for unjust enrichment for improvements. It is of interest, however, that JoAnn's position in this instance is the opposite of that taken by her in regards to Western being instructed to deed over its ownership interest in the O'Dell property. *See infra* section III.A.3.

Based on our review of the entire record, we conclude that there is substantial, albeit conflicting, evidence to support the magistrate's finding that the Ken McAffee farm was not to be included in the community estate.

## C. FmHA Debt

Prior to the parties' marriage, John incurred a Farmers Home Administration (FmHA) debt which was secured by John's separate property farm. John's testimony indicated that during the marriage, the par-

ties refinanced the FmHA debt, borrowed additional funds and that both parties had signed the refinancing documentation. JoAnn, however, testified having no recollection that the refinancing ever occurred. The farm was later sold on contract to Don Acor. John repeatedly proposed to FmHA that it accept the remaining balance due under the Acor contract in satisfaction of the debt. At the time of trial, Acor owed approximately $113,000 and was in default. The FmHA debt was $158,000 and also in default. The magistrate found that the parties were to be jointly and equally liable for the FmHA debt and any corresponding tax liability depending on the future outcome of John's proposal.

■■■■ JoAnn contends that the magistrate erred in finding that the FmHA debt was a community debt and that any tax liability from the forgiveness of this debt would be shared by the parties. There is a rebuttable presumption that a debt incurred during marriage is a community debt. *Smith v. Smith,* 124 Idaho 431, 436, 860 P.2d 634, 639 (1993); *Simplot v. Simplot,* 96 Idaho 239, 246, 526 P.2d 844, 851 (1974). In the case of a loan, the nature of the loan proceeds determines the nature of the debt. *Gardner v. Gardner,* 107 Idaho 660, 662, 691 P.2d 1275, 1277 (Ct.App.1984). If the proceeds of the loan are separate property, the debt is also separate. *Id.* Additionally, as explained by the Supreme Court:

> In determining the nature of the proceeds of a loan, examination must be made of the basis of the extension of the credit. The proceeds of loans made upon the security of a spouse's separate estate are separate, and those made upon the security of the community estate are community. This rule is based upon the fact that the estate providing the security is the primary source of repayment.

*Winn v. Winn,* 105 Idaho 811, 814, 673 P.2d 411, 414 (1983). As recognized by the Court of Appeals in *Gardner,* however, the fact that one estate provides the security does not necessarily lead to a conclusion that this

estate is also the primary source of repayment of the debt. *Gardner,* 107 Idaho at 663, 691 P.2d at 1278, *citing Lepel v. Lepel,* 93 Idaho 82, 84, 456 P.2d 249, 251 (1969). The *Gardner* court also restated the principle that "if there exists between the spouses an actual, articulated intent that the obligation be separate or community in character, that intent shall control." *Gardner,* 107 Idaho at 663, 691 P.2d at 1278, *quoting Winn,* 105 Idaho at 814, 673 P.2d at 414.

In the case at bar, it was undisputed that John incurred the FmHA debt before the parties' marriage and that the debt was secured by John's separate property. After the marriage, the debt was refinanced, and, according to John, "a little bit more money" was borrowed.

■■■ In determining that the debt was a community obligation, the magistrate found that the parties refinanced the debt during the marriage and borrowed additional funds. The magistrate, however, failed to make any findings, and the record is unclear, as to what the primary source of repayment of the debt was to be. *See Gardner,* 107 Idaho at 663, 691 P.2d at 1278. Although JoAnn may have signed the note on the refinanced debt, that factor may have been of little significance depending on the circumstances of the case. *Gardner,* 107 Idaho at 663, fn. 2, 691 P.2d at 1278, fn. 2. *See also Griffin v. Griffin,* 102 Idaho 858, 642 P.2d 949 (1982). Moreover, even if additional money was borrowed on refinancing, if John's separate property was the primary source of repayment on the debt, that portion of the debt would also be considered separate absent an overriding intent of the parties to the contrary. *Gardner,* 107 Idaho at 663, 691 P.2d at 1278.

Based on the foregoing, we cannot conclude that the refinancing of the FmHA debt secured by John's separate property converted a substantial separate debt into a community debt. Thus, we remand to the magistrate for a redetermination of whether the FmHA debt is a community or separate obligation.[5] In doing so, the magistrate should

---

5. In the event the magistrate again determines that the FmHA debt was converted from separate to community in its entirety, the magistrate then must also determine to what extent, if any, the community estate is entitled to reimbursement from John's separate estate for the community's satisfaction of ·John's separate debt to FmHA. *See Winn,* 105 Idaho at 815, 673 P.2d at

focus upon the intended source of repayment at the time of the refinancing. We note that there is a disputed allegation that this issue has become moot during the pendency of this appeal because the FmHA agreed to accept the Don Acor contract in satisfaction of the debt. Therefore, the magistrate may find it necessary to hear additional evidence on the current status of this debt following any FmHA action on John's proposal since the time the decree was entered.

### D. Post–Separation Debt

Prior to trial, the magistrate ordered that "one-half of all net income of the parties received [during their pretrial separation] shall be split equally between the parties. This amount shall be computed by deducting from gross income all necessary and reasonable expenses and debts." The order further stated that the "community debts to be paid by [John], as well as the attorney's fees paid by [John], will be accounted for at trial in adjusting the parties' community debts and assets to achieve a substantially equal division."

Based on the evidence before it, the magistrate found:

During separation, [JoAnn] collected all of the income from the Frank Hartman contract at $600 per month, Joshua Smith Foundation at $500 per month and the Butte City Apartments. She had income from Western Catering and other sources totaling a "net" of $41,323.62. See [JoAnn's] Exhibit W–W. During this time she paid no rent (Carriage House), paid few utilities and paid no community debt with the exception of some expenses related to Butte City Apartments which are "netted" out of the total represented by *[JoAnn's] Exhibit W–W*. Of this income, she could only account for approximately $10,000 in "living expenses" during cross-examination at trial. She says she paid no debt "because John never asked her to" and could not account for approximately $30,000 in income.

During separation, [JoAnn] incurred debts, as follows:

| | |
|---|---|
| Personal Loan | $1,550.00 |
| G.E. Rewards (Mastercard) | 1,393.00 |
| May–Robison (Charge Card) | 188.76 |
| Nordstrom (Charge Card) | 487.76 |
| The Bon (Charge Card) | 395.84 |
| Mervyns (Charge Card) | 241.54 |
| Neiman–Marcus (Charge Card) | 149.10 |
| Jensen Jewelers (Charge Account) | 147.90 |
| Hart Pontiac | 225.26 |
| TOTAL | $4,779.16 |

She had no charge accounts or credit cards at time of separation and stated that she incurred such debt "to establish her credit." [JoAnn] shall pay the debts listed above as her "separate" debts and representative of her 'living expenses' during separation. These debts are more than offset by her unaccounted for income during the same period.

Contrary to JoAnn's contention, the magistrate did not "selectively review" only her income and expenses. The magistrate also reviewed John's income and expenses and found that he accounted for his income, living expenses and payments of debts for the same time period. Although the magistrate did not make specific findings on the parties' necessary and reasonable expenses and debts, the essence of the magistrate's findings clearly demonstrates that the magistrate reviewed such information in making its determination. Therefore, we conclude the magistrate's findings are supported by substantial evidence.

### E. Cadillac Debt

The trial evidence showed that during the parties' separation, JoAnn purchased a 1992 Cadillac for $18,000 on a seven-year contract with a small down payment. The magistrate found that JoAnn was entitled to retain the Cadillac as community property, but that she was responsible for the underlying debt incurred to purchase the vehicle. The magistrate determined that JoAnn was to assume $9,000 in debt on the vehicle. On appeal to the district court, the district court found

415 (payments on community obligations made from husband's separate funds were subject to reimbursement to husband absent a finding that such contributions were intended as gift to the community); *Estate of Freeburn*, 97 Idaho 845, 850, 555 P.2d 385, 390 (1976) (husband's separate estate entitled to reimbursement for $30,000 payment on community debt made from separate funds).

insufficient evidence to support the magistrate's determination and remanded for a clarification of the debt. On remand, the magistrate clarified that the debt allocated to JoAnn was $18,000, not $9,000 as originally stated.

JoAnn asserts on appeal to this Court that, based on the seven-year contract payment balance, which included precomputed interest, the debt owed on the Cadillac was $21,086. JoAnn contends that the magistrate's finding on remand that the debt on the vehicle was $18,000 was not supported by the evidence.

During the appeal to the district court, however, JoAnn's attorney conceded that the debt on the Cadillac should have been the cost of the Cadillac, $18,000, minus the down payment and minus the principal payments which were included in the eight monthly payments JoAnn had made. We conclude that JoAnn's argument on this issue is without merit.

### F. Attorney Fees and Costs at Trial

 JoAnn contends that the magistrate abused its discretion by denying her attorney fees below pursuant to I.C. §§ 32–704 and –705. JoAnn also asserts that the magistrate abused its discretion by requiring JoAnn to pay her expert witness fees.

In declining to award attorney fees and expert fees, the magistrate determined:

> Based upon all of the evidence and statutory facts outlined hereinabove and the fact that [John] was the prevailing party in this litigation, and that [John] lacks the financial ability to pay [JoAnn]'s fees, *the Court concludes that each party shall pay his or her own respective attorney's fees and costs; and specifically [JoAnn] shall pay the bills for Don Cain and Evan Gray.*

 The decision of whether to award attorney fees pursuant to I.C. § 32–704 is discretionary. *Antill v. Antill*, 127 Idaho 954, 958, 908 P.2d 1261, 1265 (Ct.App.1996). Absent an abuse of discretion, a trial court's denial of attorney fees under this provision will be upheld on appeal.

Idaho Code Section 32–704(2) stated, prior to its 1994 amendment:

> . The court may from time to time after considering the financial resources of both parties and the factors set forth in section 32–705, Idaho Code, order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this act and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or after entry of judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in his name.

Idaho Code Section 32–705, incorporated by reference in I.C. § 32–704, sets forth a number of factors which the court must consider in determining whether to order a party to pay the costs and fees of the other party in a divorce proceeding. *Jensen v. Jensen*, 128 Idaho 600, 606, 917 P.2d 757, 763 (1996); *Noble v. Fisher*, 126 Idaho 885, 891, 894 P.2d 118, 124 (1995).

The magistrate, in accordance with I.C. §§ 32–704 and –705, made specific findings of fact in exercising its discretion regarding the award of attorney fees and expert witness fees. Following trial, the magistrate ordered JoAnn to be responsible for the expert fees based on several findings. First, the magistrate noted that John was the prevailing party in this matter. Second, in reference to the increase of expert fees due to the subsequent appraisal, the magistrate noted that Cain's first appraisal was accurate with a few adjustments. Third, the magistrate sustained John's objection to certain trial-related expenses. Finally, the magistrate found that JoAnn had greater income than John and that John lacked the financial ability to pay JoAnn's attorney fees. On review, we conclude that the magistrate did not abuse its discretion in ordering that each party was responsible for his or her own respective attorney fees and that JoAnn was responsible for Gray's and Cain's expert fees.

### G. Other Issues

 JoAnn has raised other issues on appeal. Because these issues are supported

by neither argument nor authority, they will not be addressed. *Powell v. Sellers*, 130 Idaho 122, 128, 937 P.2d 434, 440 (Ct.App. 1997).

### H. Attorney Fees on Appeal

Both parties seek attorney fees on appeal under I.R.C.P. 54(e)(1) and I.C. § 12–121. We conclude that neither party pursued nor defended the appeal frivolously, unreasonably or without foundation. JoAnn also claims she is entitled to attorney fees based on I.C. §§ 32–704 and –705. Based on the record before this Court, we conclude that JoAnn has failed to demonstrate that she is entitled to attorney fees pursuant to these sections. Therefore, we decline to award attorney fees to either party.

## IV.

## CONCLUSION

We affirm in part, vacate in part, and remand with respect to the division of property ordered by the magistrate in its decree of divorce, as well as the order for clarification and correction. No attorney fees or costs are awarded on appeal.

Judge LANSING and Judge SCHWARTZMAN, CONCUR.