IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of: | No. 84532-2-I |
| KRISTIN HARPER, | DIVISION ONE |
| Respondent,<br>v. | UNPUBLISHED OPINION |
| BENJAMIN STONER-DUNCAN, | |
| Appellant. | |

SMITH, C.J. — Kristin Harper and Benjamin Stoner-Duncan have been together for nearly two decades and have two children. In 2010, when Stoner-Duncan was in medical school, the couple decided that Harper would forego her academic career to be the children's primary caretaker and the family's primary breadwinner until Stoner-Duncan finished his residency and began working as an emergency physician in Seattle in 2019. Harper petitioned for dissolution in 2021 and the parties agreed to resolve the matter by arbitration. The arbitrator awarded the parties' house and maintenance to Harper, along with a $171,000 judgment to offset Stoner-Duncan's remaining medical school loans, which had been rolled into the home's mortgage.

Stoner-Duncan, appealing the trial court's refusal to vacate or modify the arbitrator's decision, asserts that the arbitrator committed an error of law by assigning a value to Stoner-Duncan's medical degree when distributing property. He also asserts that they erred when awarding the house to Harper. And he

contends that they exceeded their powers in giving most of the couple's assets to Harper. We disagree and affirm.

FACTS

Kristin Harper and Benjamin Stoner-Duncan[1] met in 2000, began cohabitating in 2003 and married in 2008. They have two children: a son, born in 2004, and a daughter, born in 2010. Over the course of their relationship, both parties pursued and received advanced degrees. Harper received a Master of Public Health in global epidemiology and a Ph.D. in genetics and microbiology from Emory University in 2008 and worked at Columbia University as a post doctoral (postdoc) scholar. Stoner-Duncan entered Columbia Medical School in 2010 and began his residency in 2014.

Harper's education was paid for by fellowships from the National Science Foundation and the Howard Hughes Medical Institute, which included stipends the couple used to support themselves. During this period—which was before Stoner-Duncan began medical school—Stoner-Duncan worked a variety of jobs, including as a lab technician, a busboy, an artist, a bartender, a stagehand, and running his own business, Ben's Bikes. When the couple moved to New York so that Harper could pursue her postdoc research, Stoner-Duncan sold his business and began to contemplate medical school. Because he needed additional

---

[1] Briefing on appeal and the record below both refer to the parties by their first names, as is customary in family law matters because individuals often share family names. Because Harper and Stoner-Duncan do not share a name, however, we will not follow suit.

pre-med requirements before applying, Stoner-Duncan attended Columbia for a year, with tuition paid by his grandfather.

The couple's daughter was born around the time Stoner-Duncan was accepted to Columbia Medical School. The next year, their son was diagnosed with Asperger's syndrome and began attending therapy five times a week. Faced with suddenly increased family demands, the couple concluded that one of them would have to give up their career prospects to become a primary caregiver, at least for a time. Because of Stoner-Duncan's considerably higher potential earnings—Harper estimated her income as a professor would at most reach $260,000—they decided that Harper would stop pursuing an academic career.

In 2013, knowing that their residence would be determined by the location of Stoner-Duncan's medical residency and reluctant to commit to any specific employer, Harper began a freelance writing business, Harper Health and Science Communication. The couple moved to Seattle for Stoner-Duncan's residency at the University of Washington. They purchased a house for $535,000 using a $230,000 gift from Stoner-Duncan's mother as a down payment.

The residency period put significant strain on their relationship, with Stoner-Duncan working 80-100 hours a week. During the residency, Stoner-Duncan made roughly $55,000 annually and Kristin worked 20 hours a week at her business.

Stoner-Duncan completed his residency in 2018 and is now an emergency room doctor at Northwest Hospital in Seattle. As of the arbitration of this case,

3

his gross monthly income was $27,703. Harper's was $10,025. Her work has been featured in a number of publications, including the New York Times, BBC, and Howard Hughes Medical Institute, and her clients have included the Bill and Melinda Gates Foundation, Medscape, the World Health Organization, and the National Institute of Health. In 2020, the couple refinanced their house to roll Stoner-Duncan's remaining $171,000 student loans into their mortgage.

Harper petitioned for dissolution of the marriage in March 2021. The parties stipulated to proceed by arbitration rather than in superior court. The arbitrator issued their decision in May 2022. They issued parenting plan and child support orders that are not at issue in this appeal. They also ordered maintenance payments from Stoner-Duncan to Harper at $5,000 per month for 78 months. The arbitrator based this award on the 10 years of support Harper provided to Stoner-Duncan as he pursued his current position as an emergency room doctor, as well as her sacrifice of her own academic career and earning potential. Taking into account Stoner-Duncan's future earning potential, the arbitrator awarded Harper the house and ordered Stoner-Duncan to pay a judgment to Harper of $171,000 to compensate for the medical school loans that are now part of the mortgage. In a somewhat unusual move, when determining the distribution of the parties' property, the arbitrator valued Stoner-Duncan's medical degree and license at roughly half a million dollars and used this value in determining the appropriate distribution of assets.

Much of the equitable reasoning behind the arbitrator's decision appears to be reflected by this table, which lays out the parties' respective contributions to their marital community:

| YEAR | [Harper] | [Harper] | [Stoner-Duncan] | Stoner-Duncan] |
|---|---|---|---|---|
| 2002 | $0 | Undergrad | $1,312 | |
| 2003 | $0 | Undergrad | $102 | |
| 2004 | $26k-30k | Grad School | $5,824 | |
| 2005 | $26k-30k | Grad School | $5,241 | |
| 2006 | $26k-30k | Grad School | $11,763 | |
| 2007 | $26k-30k | Grad School | $5,432 | |
| 2008 | $23,878 | Grad School | $0 | |
| 2009 | $77,616 | Post Doc | $17,013 | |
| 2010 | $66,112 | Post Doc | $22,704 | Med Sch |
| 2011 | $37,985 | | $0 | Med Sch |
| 2012 | $44,356 | | $0 | Med Sch |
| 2013 | $29,385 | | $0 | Med Sch |
| 2014 | $11,914 | | $24,598 | Residency |
| 2015 | $96,555 | | $51,301 | Residency |
| 2016 | $97,482 | | $55,072 | Residency |
| 2017 | $93,800 | | $60,329 | Residency |
| 2018 | $94,800 | | $77,543 | Indep K'tr |
| 2019 | $97,600 | | $237,079 | |
| 2020 | $116,000 | | $311,558 | [2] |

In short, Harper served as the couple's primary source of income throughout their relationship, including when she was in school. The marriage ended only shortly after the community began to realize the financial benefits of Stoner-Duncan's degree.

Harper moved for reconsideration, which the arbitrator denied as to most of the issues raised, though they did grant Stoner-Duncan some partial relief, including reducing the valuation of his medical degree from $542,400 to

---

[2] Minor edits have been made to this table to alter formatting and remove citations to exhibits reviewed by the arbitrator when assembling it.

$470,000. Stoner-Duncan moved the superior court to modify, correct, or vacate the arbitration. This request was denied, and the court awarded fees to Harper.

Stoner-Duncan appeals.

## ANALYSIS
### Standard of Review

Appellate review of property divisions and other orders coming out of the arbitrated dissolution of a marriage is strictly limited by the courts' interests in carving out a space for finality in arbitration. Davidson v. Hensen, 135 Wn.2d 112, 118, 954 P.2d 1327 (1998). Arbitration is governed by the Washington uniform arbitration act, chapter 7.04A RCW. Broom v. Morgan Stanley DW Inc., 169 Wn.2d 231, 236, 236 P.3d 182 (2010).

RCW 7.04A.240 and RCW 7.04A.230 lay out, respectively, the scope of a trial court's ability to modify and vacate arbitration awards, and therefore the scope of appellate review of the trial court's orders. As relevant here, modification is required where "[t]here was an evident mathematical miscalculation or an evident mistake in the description of a person, thing, or property referred to in the award." RCW 7.04A.240(1)(a). Vacation is required where, among other possibilities, there was evident partiality on the part of the arbitrator, misconduct by the arbitrator that prejudiced the rights of a party, or the "arbitrator exceeded the arbitrator's powers." RCW 7.04.230(1)(b)(i), (1)(b)(iii), (1)(d).

An error of law on the face of the award demonstrates that an arbitrator has exceeded their powers under RCW 7.04A.230(1)(d). Broom, 169 Wn.2d

6

at 237. Such error may be shown either through "adoption of an erroneous rule or mistake in applying the law." Lindon Commodities, Inc. v. Bambino Bean Co., Inc., 57 Wn. App. 813, 816, 790 P.2d 228 (1990). But the evidence before the arbitrator will not be considered. Lindon Commodities, 57 Wn. App. at 816. "Judicial review of an arbitration award, therefore, does not include a review of the merits of the case." Davidson, 135 Wn.2d at 119.

### The $230,000 Gift

We first address Stoner-Duncan's contention that the arbitrator committed an error of law in the characterization of the $230,000 gift that his mother made while the couple was purchasing their house. He asserts that the arbitrator erred by treating the gift as community rather than separate property, and therefore committed a downstream error by awarding the couple's house to Harper. The arbitrator's characterizations are supported by their factual findings. And the arbitrator's ultimate distribution of the house is not dependent on the characterization of either the house or the gift as separate or community property, but rather on their determination as to the equitable distribution of the communities' assets and liabilities given all the circumstances. We correspondingly reject this argument.

Washington is a community property state. Chapter 26.16 RCW. Property acquired by either spouse during a marriage is typically owned and managed by both partners equally. RCW 26.16.030. Property acquired before the marriage is and remains separate, as is any property acquired after the marriage but gained by "gift, bequest, devise, descent, or inheritance."

7

RCW 26.16.010. Notably, RCW 26.09.080 permits property's distribution at the end of a marriage regardless of whether it is separate or community, though it does direct the trial court to consider the nature of the property when distributing assets.

A gift of property acquired during a marriage is presumed to be community property. In re Smith's Estate, 73 Wn.2d 629, 631, 440 P.2d 179 (1968). This presumption can be rebutted by clear and convincing evidence of intent by the donor to make the gift to one spouse specifically, rather than to the community. Matter of Marriage of Olivares, 69 Wn. App. 324, 331, 848 P.2d 1281 (1993).

A trial court's characterization of property as either community or separate is a mixed question of law and fact. Matter of Marriage of Watanabe, 199 Wn.2d 342, 348-49, 506 P.3d 630 (2022). Factual findings—reviewable when made by a trial court, but not typically when made by an arbitrator—are reviewed for substantial evidence. Watanabe, 199 Wn.2d at 348-49. Where factual findings are not challenged or are supported—as here—our review is limited to whether those findings support the characterization of property as a matter of law, and review is de novo. Watanabe, 199 Wn.2d at 348-49.

In this case, Stoner-Duncan's mother gifted $230,000 toward the down payment used to purchase the couple's house. The gift letter itself named only Stoner-Duncan as a recipient. Stoner-Duncan relied on this fact to argue that the gift was meant for him along, increasing his stake in the house itself. The arbitrator disagreed. The gift was made as a part of the process of securing a mortgage and title to the house, title was in both Stoner-Duncan and Harper's

8

names, and the gift letter itself was required by the lender as a condition of the mortgage. Harper testified that Stoner-Duncan's mother represented the gift as meant for both of them. And Harper used some of her separate property to purchase the house and mortgage payments were made from community funds. The arbitrator therefore found that Stoner-Duncan had not demonstrated that the gift was intended for him as separate property, regardless of its nominal assignment to him alone. Additionally, when refinancing the mortgage, title remained in both the parties' names. The arbitrator found as a result that no evidence supported the notion that the house itself was intended to be anything other than community property.

As findings of fact going to intent, and with intent determinative of the legal character of property, this panel is not in a position to decide that either the house or the gift of $230,000 are anything other than community property. This is because our review is limited to errors of law or mathematical miscalculations, and Stoner-Duncan's challenge goes instead to the merits of the arbitrator's decision. We see no error of law or mathematical miscalculation here.

Additionally, though RCW 26.09.080 requires consideration of the separate or communal nature of property before it is divided, property of either nature may be distributed to either spouse if it is just and equitable to do so. Regardless of the nature of the property, then, the arbitrator did not error.

### Division of Property and Maintenance Award

We now address Stoner-Duncan's challenges to a number of the arbitrator's decisions in deciding how to divide the couple's property and whether

to award maintenance. He raises two primary concerns in this context. He asserts, first, that the arbitrator erred in assigning a value to his professional degree. He then asserts that the arbitrator did not properly account for the $171,000 judgment against him. He characterizes these as errors of law or evident mathematical miscalculations that led to an inequitable distribution of property and an inequitable maintenance award.

We disagree. The arbitrator's division of property and award of maintenance both took into account a range of equitable factors. Their treatment of Stoner-Duncan's professional degree assigned it a monetary value as an aid to provide understanding of their thought process about the property division. More broadly, the distribution of assets and liabilities and award of maintenance do not constitute an error of law. Despite Stoner-Duncan's attempt to paint the arbitrator's responsibility as *equally* distributing assets, their duty was instead to create an *equitable* distribution.

### 1. Principles of Property Division and Maintenance

A brief overview of the dissolution process's treatment of property distribution and maintenance is useful. Asset distribution at the end of a marriage is guided by RCW 26.09.080, which, although statutory, retains many of the equitable characteristics that courts have traditionally applied. The statute directs the dividing tribunal to, "without regard to misconduct, make such disposition of the property and the liabilities of the parties, either community or separate, as shall appear just and equitable after considering all the relevant factors." RCW 26.09.080. It lists four non-exclusive factors to consider:

(1) The nature and extent of the community property;

(2) The nature and extent of the separate property;

(3) The duration of the marriage or domestic partnership; and

(4) The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective.

RCW 26.09.080.

A tribunal's powers when seeking to place the parties on just and equitable footing are not limited to distribution of property held by the parties at the time of their dissolution. Tribunals may also award maintenance, ongoing monetary support from one former spouse to another. RCW 26.09.090(1). Maintenance is awarded "in such amounts and for such periods of time as the court deems just" and, like property distribution, is made without consideration of misconduct. RCW 26.09.090(1). The statute again lists a number of non-exclusive factors for the tribunal to consider when awarding maintenance:

(a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;

(c) The standard of living established during the marriage or domestic partnership;

(d) The duration of the marriage or domestic partnership;

(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial

11

obligations while meeting those of the spouse or domestic partner seeking maintenance.

RCW 26.09.090(1).

The tribunal's powers are plainly broad. And both maintenance and property distribution are guided principally by concerns about equity and justice in light of the parties' circumstances. Fundamentally, "[a]n equitable division of property does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties." Matter of Marriage of Crosetto, 82 Wn. App. 545, 556, 918 P.2d 954 (1996).

Of particular concern to Stoner-Duncan is the arbitrator's treatment of his professional degree, to which they assigned a monetary value of roughly half a million dollars when dividing property, and then considered when awarding Harper a maintenance award.

Washington's treatment of professional degrees in cases like the present one is best described in the seminal decision on the subject, Washburn v. Washburn:

> When a person supports a spouse through professional school in the mutual expectation of future financial benefit to the community, but the marriage ends before that benefit can be realized, that circumstance is a "relevant factor" which must be considered in making a fair and equitable division of property and liabilities pursuant to RCW 26.09.080, or a just award of maintenance pursuant to RCW 26.09.090. A professional degree confers high earning potential upon the holder. The student spouse should not walk away with this valuable advantage without compensating the person who helped him or her obtain it.

101 Wn.2d 168, 178, 677 P.2d 152 (1984). The tribunal "may compensate a

spouse who has assisted the student spouse in obtaining his or her professional degree . . . through property division, maintenance, *or a combination of these.*" Fernau v. Fernau, 39 Wn. App. 695, 707, 694 P.2d 1092 (1984) (emphasis added).

Washburn lists a number of factors for tribunals to consider while distributing assets and awarding maintenance based on one spouse's support for the other during professional school: (1) the amount of community funds expended for educational costs, though not living expenses that would have been incurred regardless; (2) the amount the community would have earned had the student spouse not been pursuing professional school; (3) any education or career opportunities foregone by the supporting spouse; (4) the future earnings of each spouse. 101 Wn.2d at 179-80. These first two standards consider the past conditions of the marriage, while the third and fourth allow adjustment of any corresponding award to account for future circumstances as well. Washburn, 101 Wn.2d at 180-81. Where maintenance is concerned, Washburn emphasizes that it "is not just a means of providing bare necessities, but rather a flexible tool by which the parties' standard of living may be equalized for an appropriate period of time." 101 Wn.2d at 179.

2. The Arbitrator's Awards

The arbitrator in this case considered Stoner-Duncan's professional degree and license both in distributing assets and in awarding maintenance, as Washburn allows. The basic distribution of the assets was simple and, in the arbitrator's calculation, reflected an equitable split between the Stoner-Duncan

and Harper accounting for Stoner-Duncan's degree. Harper was awarded the couple's Ballard house, valued at $970,000 but encumbered by a $389,043 mortgage, leaving an actual value of $580,957. She also received her business, Harper Health and Science Communications, LLC, valued at $41,000, $31,126 of the couple's bank accounts, $24,786 of their investment accounts, and $221,352 of their retirement accounts. These assets total $899,221.

Stoner-Duncan, meanwhile, received $59,993 of the bank accounts, $63,223 of their investment accounts, and $284,658 of their retirement accounts.[3] He also retained his share of ownership of an island in Canada, valued at $14,500. And the arbitrator gave a value of $472,000 to his medical degree and license to determine how they arrived at an equitable split of the parties' assets and liabilities. In making this determination the arbitrator considered two components: (1) the money spent in obtaining the degree, and (2) the lifetime earnings that would not be realized by the community.[4] This provided an illustrative value of $894,374 to Stoner-Duncan's assets. The couple's personal property was divided more or less evenly.

Stoner-Duncan was also ordered to pay a judgment of $171,000 to Harper. This accounted for his outstanding medical education debt, which the

---

[3] As Stoner-Duncan points out, the arbitrator's property division sheet contains a scrivener's error. It awards Stoner-Duncan a Fidelity account valued at $52,564.08 as well as a Vanguard 401k valued at $57,525.69, but erroneously counts both accounts as worth $52.564 in the column totaling the valuation of his assets. The correct total is $284,658.

[4] The arbitrator initially valued the degree at $542,500, 10 percent of an expert witness's valuation of his future earnings. On reconsideration, it lowered this amount slightly to the $472,000 figure.

14

couple had rolled into their mortgage several years earlier and which, as a result, Harper would otherwise have been responsible for paying off.

In addition to the property division, the arbitrator awarded Harper maintenance of $5,000 a month for 78 months—a total of $390,000. The arbitrator found that Harper "set aside her career and her professional and financial advancement to support through . . . 4 years of medical school, through 4 years of his residency, through a lap year, and while he established his current position as an ER doctor." The arbitrator viewed maintenance as "a reasonable and appropriate way to compensate her for the income she has foregone and the financial gain Stoner-Duncan will enjoy."

The arbitrator's decision may also have been informed by testimony that Harper is going blind. Harper asserted that she is losing her eyesight and might become blind because of a hereditary disease. Stoner-Duncan presented Harper's condition as less severe, limited to "droopy eyelids and dry eyes," and not one that would significantly affect her ability to work or live. The arbitrator did not make a finding on this factual dispute, but did state in passing that Harper "is slowly going blind, which [Stoner-Duncan] verified."

Much of the dispute in this case arise out of the arbitrator's use of a property division spreadsheet. Stoner-Duncan's degree was included on the spreadsheet as an asset he possessed, valued at $472,000. The $171,000 judgment against him however, was excluded from the spreadsheet. The result is that the spreadsheet creates the appearance of an equal property distribution, with each spouse awarded roughly half of their total shared assets.

### 3. Valuation of the Degree

Stoner-Duncan contends, first, that the arbitrator's decision to assign a monetary value to his degree and include it in the property division spreadsheet was error, saying that "a spouse's earning capacity or future earning potential, like a professional degree, is not an asset that can be valued and used to offset an award of other assets." We conclude that the arbitrator acted within their powers when considering Stoner-Duncan's degree.

Washburn is clear that a professional degree or license may be a "relevant factor" in distributing property. 101 Wn.2d at 178. In this case, the heuristic used by the tribunal was to assign a monetary value to the degree to equitably weigh property distribution to Harper by accounting for Stoner-Duncan's future earning potential. That value was then included in the property division spreadsheet as an asset on Stoner-Duncan's side of the ledger. This is unusual, and does not conform to the usual practices when making a property division spreadsheet. These spreadsheets typically tally assets and liabilities understood as financial items that are fungible, transferable, and either monetary or easily reducible to a monetary value. Professional degrees and licenses are not typically included as assets on these spreadsheets. By including the degree's value on the spreadsheet, the arbitrator included an atypical asset to demonstrate the financial parity they determined in the asset distribution.

Though the arbitrator's approach was unusual, their property distribution, understood holistically, nevertheless did not exceed their statutory powers. Instead, by assigning Stoner-Duncan's degree a monetary value, they quantified

how a just and equitable distribution was accomplished without an entirely *equal* distribution. An entirely equal distribution would have ignored the resulting inequity caused by Stoner-Duncan's professional prospects and earning potential in comparison to Harper's.

Stoner-Duncan cites to case law when attempting to rebuff this, but these citations are unhelpful to him. Washburn, it is true, declined "to address at this time the somewhat metaphysical question of whether a professional degree is 'property.' " 101 Wn.2d at 176. It is "property" in its more usual sense that is included on property division spreadsheets, a practice that accords with the tribunal's statutory mandate to distribute separate and community *property* held by the spouses. See RCW 26.09.080 (requiring "disposition of the property and liabilities of the parties"). But as already discussed, Washburn went on to allow consideration of a degree in property distribution, leaving it to the tribunal to determine the method to do so. And In re Marriage of Hall, which Stoner-Duncan also cites, explicitly says that "we have emphasized future earning capacity as a factor to be considered in property distribution in the context of professional degrees." 103 Wn.2d 236, 247, 692 P.2d 175 (1984). We conclude that Stoner-Duncan's critique of the way in which the arbitrator used his degree to demonstrate a just and equitable property distribution does not, on its own, establish that the arbitrator exceeded their authority.

4. The Distribution and Maintenance Were Not Inequitable

Stoner-Duncan next contends that the arbitrator erred by considering his degree in three places: distribution of property, the award of maintenance, and

17

the separate $171,000 judgment. He asserts that this counts his degree against him three times; a mathematical error and an error of law. He points out that the division of assets, when his professional degree is removed from consideration and the judgment is accounted for, awards Harper roughly 80 percent of the couple's existing assets. He treats this as a distribution so lopsided that it constitutes an error of law. We disagree.

Washburn and its progeny cases are clear that a professional degree may be considered not only when distributing property but simultaneously elsewhere. The question is whether the final distribution and maintenance are, examined as a whole, equitable.[5] There is good reason for this. A dissolution may come at a time when all the costs of a degree have already been borne by a community, but the benefits of that degree have not yet accrued or are only beginning to accrue. Where this happens, one party may reap the benefits of the other's sacrifices, while the other spouse is left having permanently forgone opportunities. Asset distribution alone can, as a result, be insufficient to address the inequities caused by the community's dissolution, because the community will not have had the time to accumulate sufficient assets to address the inequity. In these circumstances, distribution of assets may be weighted toward non-

---

[5] Stoner-Duncan also asserts that there is an internal conflict in the arbitrator's decision by saying that this unequal distribution conflicted with their stated intent. But the pages of the arbitrator's decisions to which he cites do not support the inference he encourages us to make that the arbitrator sought to *equally* distribute the community's assets. Instead, those portions of the arbitrator's decisions repeatedly reference the creation of "just and equitable" distribution and affirm the arbitrator's belief that the distribution in this case matches that standard.

professional spouse, but that spouse may *also* receive maintenance and other benefits to account for the sacrifices they made in support of the spouse whose earning capacity is now higher.

That is precisely the situation here.  The arbitrator's unchallenged (and unchallengeable) findings of fact demonstrate that Harper, for over a decade, supported Stoner-Duncan as he applied to medical school, attended medical school, went through residency, and established his career.  She did so at a cost to her own career, and with the assumption that she and their family as a whole would be able to benefit from his higher earning capacity.  This dissolution came only shortly after the community began to see the benefits of Stoner-Duncan's degree.  And the degree's value was not doubly or triply counted, since the arbitrator's valuation of the degree during asset distribution only considered less than 10 percent of its total value as measured in future earnings.  Similarly, the arbitrator's award of a separate $171,000 judgment was also not error.  This award reflected Stoner-Duncan's remaining medical school debt, now incorporated into the mortgage for which Harper is responsible.  Distributing that debt to Stoner-Duncan is does not mean that the arbitrator counted his degree against him more than once.

Stoner-Duncan also attacks the arbitrator's treatment of the $171,000 judgment by saying that they should have placed it on the property distribution spreadsheet.  It's absence from that document, he asserts, makes it appear that the distribution of property was wholly equal while ignoring a significant liability on his side.  Certainly, including the $171,000 judgment on the spreadsheet

would allow for a more complete view of the parties assets and liabilities at the end of the dissolution process. But the spreadsheet is only one part of the arbitrator's final order, and the treatment of the $171,000 medical school debt and the reasoning behind the distribution and maintenance decisions is thoroughly explained elsewhere in their decision. Our concern is whether the arbitrator committed an error of law and exceeded their statutory authority. Once again, the asserted error must be analyzed in light of whether it rendered the property distribution as a whole unjust and inequitable. Where, as here, the spreadsheet was used to illustrate the arbitrator's thought process as a supplement to the nearly 100 other pages of analysis and background they had provided, this exclusion is not an error of law.[6]

The arbitrator's decision fully and completely addressed the couple's assets and liabilities. It is considered, thoughtful, and thorough. As a result of this, any fault in the spreadsheet, despite the spreadsheet's lack of total fidelity to the reasoning behind the arbitrator's decision, is not fatal to the decision as a whole. Nor is the arbitrator's treatment of Stoner-Duncan's degree erroneous. The value the arbitrator assigned to it at various places in the decision— $472,000 during asset distribution, the maintenance award of $390,000, and $171,000 payment of his medical debt—is reflective of the difference in Stoner-Duncan's future earning capacity as compared to Harper's. Considering the

---

[6] We emphasize that our review is not de novo. We are not determining whether we agree with the arbitrator's decision or would have arrived at the same decision. Our review is very narrow: whether the arbitrator committed an error of law or a mathematical miscalculation.

parties' 20-year relationship, and the opportunities Harper forwent to support him, the arbitrator's decision as a whole is just and equitable. We find neither mathematical error nor an error of law.

### Attorney Fees Below

Stoner-Duncan contests the trial court's award of fees to Harper.

RCW 7.04A.250 permits the award of fees and costs to the prevailing party on motions to confirm, vacate, modify, or correct an arbitration award. The trial court below, rejecting Stoner-Duncan's challenge to the arbitrator's decision, awarded Harper attorney fees as the prevailing party.

Stoner-Duncan now asks this court to reverse that award. His request, however, is premised on us agreeing with his arguments that the arbitrator exceeded their powers. Since we do not, we affirm the fee award.

### Attorney Fees on Appeal

Both sides request fees on appeal. We may rely on applicable law to grant party's reasonable attorney fees and costs on review. RAP 18.1(a). We may therefore award fees to the party who prevails on appeal under RCW 7.04A.250. We award fees to Harper.

Stoner-Duncan contends that Harper did not adequately brief this issue, nitpicking her citations to authority and mischaracterizing her request. He latches onto her use of the word "frivolous" and her assertion that his arguments on appeal are not "meritorious" to characterize her request for fees as one made because his arguments were frivolous. He then argues that she did not cite to relevant authority to make this request. See Faulkner v. Racquetwood Vill.

Condo. Ass'n, 106 Wn. App. 483, 487, 23 P.3d 1135 (2001) (failure to cite applicable law supporting grant of attorney fees supported denial).

But Harper's request for fees comes directly after her discussion of RCW 7.04A.250, which supports her request as the prevailing party. Her citation to the appellate rules is, admittedly, to RAP 18.2(c), rather than to RAP 18.1. But this is a clear scrivener's error; RAP 18.2, concerning voluntary withdrawal of review, has no subparts, and RAP 18.1(c) concerns affidavits of need submitted to support fee awards. We reject Stoner-Duncan's attempt to read all meaning out of Harper's request and award her fees.[7]

We affirm.

_Smith, C.J._

WE CONCUR:

_Díaz, J._        _Mann, J._

---

[7] Both parties have filed affidavits of financial need and argue about whether this is necessary and appropriate at this step. We disregard these affidavits. Where financial need is relevant to an attorney fee award, affidavits can be considered. RAP 18.1(c). Here, because an award is to the prevailing party, they are superfluous.